21-1778(L)
*United States v. Avenatti*

# In the
# United States Court of Appeals
# for the Second Circuit

———————

AUGUST TERM 2022

Nos. 21-1778(L), 22-351(CON)

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL AVENATTI,

Defendant-Appellant.

———————

ARGUED: JANUARY 19, 2023

DECIDED: AUGUST 30, 2023

———————

Before: WALKER, RAGGI, and PARK, Circuit Judges.

———————

On appeal from a judgment of conviction entered in the Southern District of New York (Gardephe, *J.*), defendant, a California-licensed attorney, challenges (1) the sufficiency of the evidence supporting his conviction for transmitting extortionate communications in interstate commerce to sportswear leader Nike, *see* 18 U.S.C. § 875(d); attempted Hobbs Act extortion of Nike, *see id.* § 1951; and honest-services wire fraud of the client whom defendant was purportedly representing in negotiations with Nike, *see id.* §§ 1343, 1346. Defendant further challenges (2) the trial court's jury

instruction as to honest-services fraud, and (3) the legality of a $259,800.50 restitution award to Nike.

AFFIRMED.

———————————

DANIEL HABIB, Appeals Bureau, Federal Defenders of New York, Inc., New York, NY, *for Defendant-Appellant*.

MATTHEW D. PODOLSKY, Assistant United States Attorney (Daniel C. Richenthal, Robert B. Sobelman, Danielle R. Sassoon, Assistant United States Attorneys, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

———————————

REENA RAGGI, *Circuit Judge*:

Attorney Michael Avenatti appeals from an amended judgment of conviction entered on February 18, 2022, in the United States District Court for the Southern District of New York (Paul G. Gardephe, *Judge*), after a jury found Avenatti guilty of transmitting extortionate communications in interstate commerce, *see* 18 U.S.C. § 875(d) (Count One); attempted Hobbs Act extortion, *see id.* § 1951 (Count Two); and honest-services wire fraud, *see id.* §§ 1343, 1346 (Count Three). Sentenced, *inter alia*, to an aggregate prison term of 30 months and ordered to pay $259,800.50 in restitution under the Mandatory Victims Restitution Act of 1996 ("MVRA"), *id.* §§ 3663A, 3664, Avenatti challenges (1) the sufficiency of the evidence

supporting each count of conviction, (2) the trial court's failure to give his requested jury instruction as to honest-services fraud, and (3) the legality of the restitution order.  Because none of these challenges has merit, we affirm the judgment of conviction.

## BACKGROUND

### I.    Trial Evidence

The crimes of conviction took place in March 2019 while Avenatti was representing Los Angeles youth sports coach Gary Franklin in negotiations with sportswear leader Nike.[1]  Critical to the two extortion crimes was Avenatti's threat to cause Nike reputational and financial injury if it did not pay him millions of dollars.  Critical to the fraud crime was a scheme to deprive Franklin of Avenatti's honest legal services in negotiations with Nike by (unbeknownst to Franklin) conditioning a settlement with Franklin on Avenatti's own receipt of a solicited multi-million-dollar bribe.  Because Avenatti argues that the trial evidence was insufficient to support conviction on any of these crimes, we recount that evidence in some detail and in the light most favorable to the prosecution.  *See United States v. Raniere*, 55 F.4th 354, 364 (2d Cir. 2022).

#### A.    Gary Franklin's Relationship with Nike

Prosecution witness Franklin was the founder and program director of California Supreme ("Cal Supreme"), a nonprofit youth-basketball organization.  For many years, Franklin himself coached Cal Supreme's premier age-17-and-under team, a number of whose

---

[1] In this opinion we use "Nike" to refer to the parent company as well as to various subsidiaries and subordinate entities.

3

members went on to play for college and professional basketball teams.

Sometime in 2006-2007, Nike began sponsoring Cal Supreme, providing approximately $192,000 in annual support and affording access to Nike's Elite Youth Basketball League.[2]  According to Franklin, about a decade into this relationship, Nike employees Jamal James and Carlton DeBose directed him to pay additional Nike money to certain players' parents and handlers and to conceal those payments with false invoices.  Franklin also accused James and DeBose of bullying him to step down from his coaching role with Cal Supreme in favor of a player's parent.

As a result of these events, in February 2018, Franklin sought advice from Jeffrey Auerbach, an entertainment industry consultant whose son had played on a Cal Supreme team.  When, in September 2018, Nike stopped sponsoring Cal Supreme altogether, Franklin asked Auerbach for help getting the sponsorship renewed.  Auerbach testified that he told Franklin that the payments he had been directed to make were similar to payments that had resulted in the conviction of an Adidas executive in the Southern District of New York.[3]

The following year, on February 6, 2019, Auerbach contacted a Nike executive whom he knew to pursue Franklin's complaints. When the executive told Auerbach that he would have to discuss the matter with Nike's outside counsel, Boies Schiller Flexner LLP ("Boies

---

[2] Nike provided $72,000 in cash, with Franklin keeping $30,000-35,000 as salary.  The remainder was supplied as sports equipment.

[3] *See generally United States v. Gatto*, 986 F.3d 104 (2d Cir. 2021) (upholding conviction of Adidas executive).

Schiller"), Auerbach and Franklin decided that they too needed the assistance of an attorney.

## B. Avenatti's Initial Communications with Franklin

On February 28, 2019, Auerbach, on Franklin's behalf, contacted Michael Avenatti, a California-licensed attorney. Auerbach told Avenatti that Nike employees James and DeBose had "abused and bullied" Franklin to make payments to players' families, that Franklin "felt really terribly about it," and that he wanted to "report it to Nike" and "go with them [*i.e.*, Nike] to the authorities." Trial Tr. 715. Auerbach stated that Franklin also "wanted to reestablish his relationship with Nike," but that "above all" he wanted "justice," which to Franklin meant making sure James and DeBose "did not hurt any other coaches and program directors." *Id.* Auerbach testified that he did not raise the possibility of either an internal investigation or a press conference with Avenatti, deeming the former unnecessary because Franklin "knew what happened," and the latter "damaging and detrimental to reaching [Franklin's] goals." *Id.* at 717-18.

Avenatti met with Franklin and Auerbach on March 5, 2019.[4] The two men explained to Avenatti Franklin's concerns with Nike's withdrawn sponsorship of Cal Supreme and showed Avenatti documents—including bank statements, text messages, and emails— that detailed payments that Franklin had made to certain players' parents and handlers at James's and DeBose's direction. Franklin

---

[4] Before this meeting, Avenatti asked Los Angeles attorney Mark Geragos, who knew Nike's general counsel, to work with him on the Franklin matter. Neither Franklin nor Avenatti would know of Geragos's involvement until after Avenatti's arrest.

testified that he considered the documents confidential and never gave Avenatti permission to publicize them. At the March 5 meeting, Auerbach and Franklin also both detailed the "justice" that Franklin was seeking: (1) to reestablish a sponsorship relationship with Nike, (2) to resume coaching his former team, (3) to have James and DeBose fired, (4) to receive whistleblower protection, and (5) to be paid some sort of compensation by Nike. Franklin emphasized that maintaining a relationship with Nike was important to him and that again coaching his former team was "the most important thing." *Id.* at 1542. While Auerbach referenced Franklin's desire to report misconduct "to the government . . . with Nike," neither he, Franklin, nor Avenatti mentioned the possibility of public disclosure or any internal investigation at Nike. *Id.* at 730.

Although no retainer agreement was entered into on March 5 (or at any time thereafter), Avenatti signaled to Franklin that he would serve as his lawyer, instructing Franklin "not [to] speak" to the FBI or to any official or person who might approach him but, rather, to "tell them to talk to your attorney." *Id.* at 742. Avenatti also told Franklin, "we're going to get you justice," and "we need to get you immunity." *Id.*

## C.  Avenatti's Financial Difficulties

In March 2019, Avenatti's financial situation was precarious. Evidence showed that outstanding judgments against him totaled approximately $11 million, and that in November 2018, his law firm had been evicted from its Los Angeles office for non-payment of rent. Sometime in the period March 15-25, 2019, Avenatti's office manager recalled him saying that he was working on something that could

6

allow him to "clear the deck of what was owed and start a new firm." *Id.* at 1405-06. Avenatti said "something having to do with an in-house or internal investigation," but she could not remember the particulars. *Id.* at 1406.

As the following trial evidence showed, what Avenatti was working on in mid-March 2019 was a scheme to use an internal investigation retainer agreement as the vehicle for extorting millions of dollars from Nike to his own benefit and in breach of the fiduciary duty he owed Franklin.

### D. Avenatti's Discussions with Nike

#### 1. Initial Contact

On March 12, 2019, Geragos contacted a Nike attorney to request a meeting for Avenatti. When Geragos advised Avenatti that the Nike attorney had referred him to Boies Schiller, Avenatti's response revealed that he had already identified an internal investigation and a threat of public disclosure as crucial to his negotiations with Nike. In a March 13 text message, he instructed Geragos to insist on dealing directly with Nike because Boies Schiller would "never step aside and allow [Avenatti and Geragos] to run an investigation" at Nike. *Id.* at 1858; Gov't Ex. 103B. In a March 14 text message, Avenatti asked for a status report on "Nike and whether I need to start arranging my presser," *i.e.*, press conference. Trial Tr. 1858-59; Gov't Ex. 103C.

Also on March 13, 2019, Boies Schiller partner (and prosecution witness) Scott Wilson called Geragos to inquire as to the subject of the requested meeting. Geragos told him the matter "was too sensitive to

7

discuss over the phone," but "suggested that Nike might have an Adidas problem." Trial Tr. 203-04. The men agreed to meet in New York on March 19, 2019, along with Nike's vice-president and chief litigation officer Robert Leinwand.

On March 17, 2019, when Geragos confirmed this appointment to Avenatti, Avenatti replied that if the meeting "doesn't work out," he had arrangements in place to hold a press conference on March 20, 2019, and to have a story appear in the *New York Times*. Gov't Ex. 103D. Phone records showed that Avenatti had contacted *New York Times* reporter Rebecca Ruiz on March 16, 2019.

On March 18, 2019, the day before the scheduled Nike meeting, Avenatti met with Franklin and Auerbach. Auerbach had earlier emailed Avenatti documents marked "Privileged & Confidential" detailing Franklin's dealings with Nike, including specific payments Franklin made to identified persons with respect to identified players. Gov't Exs. 305, 308. At the March 18 meeting, Auerbach provided Avenatti with still more such documents, which he and Franklin also considered confidential.

Avenatti told Franklin and Auerbach that at the next day's meeting with Nike, he expected to get Franklin some sort of immunity and $1 million in compensation, and to get James and DeBose fired. He would also try to reestablish a relationship between Nike and Cal Supreme. When Franklin asked about regaining control of his 17-and-under team, Avenatti said he did not think that likely. Franklin nevertheless understood that Avenatti would at least try to achieve that goal as well as the others. Avenatti made no mention of his plans

8

to demand an internal investigation retainer or to make public Franklin's story.

## 2. The March 19, 2019 Meeting

The March 19 meeting was held at the Manhattan office of Geragos's law firm and attended by him, Avenatti, Wilson, Leinwand, and Boies Schiller associate Benjamin Homes.[5] Avenatti stated that he represented a whistleblower with information about Nike paying amateur players, corroborated by documents implicating Nike employees James and DeBose. Later in the meeting he would identify Franklin as the whistleblower.

Adopting what the Nike representatives perceived as an aggressive and bullying tone, Avenatti stated that "Nike was going to do two things": (1) "pay a civil settlement to his client" for "breach of contract, tort, or other claims"; and (2) hire Avenatti and Geragos "to conduct an internal investigation into corruption in basketball." Trial Tr. 213.[6] As to the second demand, Avenatti stated that if Nike preferred to have other attorneys conduct an internal investigation, it would still have to pay Avenatti and Geragos in an amount twice

---

[5] Leinwand and Homes also testified for the prosecution at trial.

[6] Wilson testified that he understood the two demands as "[s]eparate but both mandatory." Trial Tr. 243. Wilson and Leinwand were taken aback by the second, thinking it reflected a conflict of interest. As Wilson put it: "I never heard of it, that [an attorney who was] adverse to you, [could] also represent you in a tense, high-profile, problematic criminal investigation." *Id.* at 312.

whatever it paid the lawyers who actually did the investigatory work.[7]

Avenatti made no mention of Nike firing James and DeBose, although Franklin had identified that as one of his specific objectives. Nor did he ask for Nike to renew its sponsorship of Cal Supreme or explore the possibility of Franklin's resuming his coaching role with Cal Supreme's 17-and-under team. Indeed, rather than raise the last possibility, Avenatti conceded it. Homes recalled him "stat[ing] as a matter of fact that Gary Franklin . . . would never be able to work with Nike again." *Id.* at 1431.

Avenatti told Nike's representatives that if his two demands were not promptly met, "he was going to blow the lid on this scandal." *Id.* at 217. He proposed to do so not by bringing a lawsuit on his client's behalf but, rather, by having a *New York Times* reporter write a story and by himself holding a press conference the next day. These actions, he predicted, "would take billions of dollars off the company's market cap." *Id.* at 218. Avenatti then showed the Nike representatives some of the documents Franklin and Auerbach had given him.

When Wilson stated that Nike would need more than a day to respond to the stated demands, Avenatti opposed delay, noting that it was the eve of NCAA basketball's "March Madness" and of Nike's

---

[7] Wilson understood this to mean that "if [Nike] hired another law firm" to conduct an internal investigation and "they did a lot of work and it cost [Nike] $5 million, [Avenatti] would get paid $10 million or two times that for no work." Trial Tr. 267.

earnings call.[8]  Urging forbearance, Wilson observed that a public scandal could "destroy the life or destroy the career of some of these kids" whose parents or handlers had received payments.  *Id.* at 259.  In response, Avenatti shouted, "I don't give a f--k about those kids."  *Id.* at 1170.  He said that delay would "f--k him and Mr. Geragos"—making no mention of any effect on his client Franklin.  *Id.* at 1506.[9]

After the meeting, Avenatti spoke by telephone with Franklin and Auerbach, reporting that "things went well," that he had told Nike it had a problem, and that another meeting would be held on March 21.  *Id.* at 1567.  He made no mention of his retainer demand or of his threat to hold a press conference or otherwise publicize the information that Franklin and Auerbach had given him.

Meanwhile, a few hours after the meeting, Wilson and Leinwand contacted federal prosecutors in the Southern District of New York, disclosed what had occurred at the meeting, and agreed to cooperate in an investigation of Avenatti and Geragos.  As a result, their subsequent conversations with Avenatti and/or Geragos were recorded by the FBI.

### 3.    The March 20, 2019 Call

Soon after 5:00 p.m. on March 20, 2019, Wilson participated in a recorded telephone call with Avenatti and Geragos.  In this call,

---

[8] Wilson understood Avenatti to be referencing "a moment when [Nike's] stock price might be particularly volatile and particularly subject to the impact of news stories breaking right then."  Trial Tr. 258.

[9] Asked at trial whether Avenatti had said that delay would "f--k him and Mr. Geragos or f--k Mr. Franklin?," Homes replied, "No, no.  F--k him and Mr. Geragos."  Trial Tr. 1506-07.

which is the subject of Count One, Wilson stated that Nike was "not going to give you everything you want, but I think we can give you much of what you want." Gov't Ex. 1T at 3.[10] Avenatti responded by reiterating his two demands: "we're gonna get a million five for our guy, and we're gonna be hired to handle the internal investigation," emphasizing that "if you don't wanna do that, we're done." *Id.* at 4. As to the retainer demand, Avenatti warned that Nike should not be thinking "[a] few million dollars," because, at that amount "it's worth more in exposure to me to just blow the lid on this thing." *Id.* So, if Nike were thinking a retainer could "be capped at 3 or 5 or 7 million dollars, like let's just be done." *Id.* at 5.

When Wilson said he needed some idea what Avenatti would charge for an internal investigation, Avenatti asked what Boies Schiller would charge. When Wilson suggested "millions," Avenatti pushed back: "No you guys would charge . . . tens of millions of dollars, if not hundreds." *Id.* at 8-9. Avenatti reiterated that an agreement to pay him "single digit millions"—"five, six, eight, nine million dollars,"—was "not in the ballpark." *Id.* at 10. Eventually, Wilson said that he "suppose[d]" an "investigation like this" could

---

[10] Government Exhibit 1T is a transcript that was received as an aid to the jury in listening to admitted Government Exhibit 1, the actual recording of the March 20, 2019 call. For ease of reference, we cite to transcripts throughout this opinion, although we have reviewed the original recordings received in evidence.

12

"hit the ten to twenty million dollar range"—Avenatti characterized the amount as within a "degree of reasonableness." *Id.* at 12.[11]

The men agreed to another meeting on Monday, March 25.

### 4. The March 21, 2019 Meeting

Wilson, Homes, Avenatti, and Geragos in fact met the following afternoon. Starting with what he characterized as "the easiest part," Avenatti handed Wilson a draft settlement agreement among Nike, Franklin, and Cal Supreme, which obligated Nike to pay Franklin $1.5 million in return for a general release of any claims against the company. Gov't Ex. 2T at 10. That document made no mention of Avenatti's retainer demand.

Instead, Avenatti proposed for that demand to be addressed in a separate "confidential retainer agreement" among Nike, himself, and Geragos. *Id.* at 15. Avenatti produced no draft for such an agreement, but stated that it would have to provide for Nike to pay him and Geragos a "12 million dollar retainer upon signing," and for that amount to be "deemed earned when paid." *Id.* at 14. Avenatti said the agreement could be capped at $25 million, but would have to

---

[11] Wilson testified that he proposed this range because he "was worried that if I gave [Avenatti] the impression that Nike wouldn't pay . . . he would have . . . immediately gone to the press and started executing on his threat. . . . [S]ince he repeatedly said he didn't think that the payment on the second component could be less than in the single-digit millions, I picked the first double-digit millions . . . and said . . . maybe it could be that." Trial Tr. 293.

13

guarantee a minimum total payment of $15 million.[12] In response to Wilson's inquiry as to the intended scope of the internal investigation, Avenatti stated that it was "payments made to players in order to route them to various colleges, or shoe contracts, prior to them being eligible to receive any such payments." *Id.* As to billing rates and costs, Avenatti proposed blended hourly rates of $950 for attorneys and $450 for paralegals and reimbursement of all out-of-pocket expenses.

When Wilson observed that he had never received a $12 million retainer from Nike or done $10 million of work on an investigation for the company, Avenatti was dismissive, vulgarly suggesting he was in a stronger bargaining position with respect to Nike than Wilson had ever been: "Have you ever held the balls of the client in your hand where you can take 5, 6 billion dollars in market cap off of 'em?" *Id.* at 23. Avenatti stated that, when compared to the damage he could cause Nike, his $25 million demand was not "a lot of money in the grand scheme of things." *Id.* at 24.

Avenatti assured Wilson that if Nike acceded to his retainer demand, Avenatti would maintain strict confidentiality and hold no press conferences unless "directed to do so by Nike" because, at that point, "Nike's our client." *Id.* at 14. He emphasized further that it would be "up to the client [*i.e.*, Nike] as to whether they want to self-

---

[12] In short, Nike would be obligated to pay Avenatti $12 million as soon as a retainer agreement was signed; deem that amount earned when paid, *i.e.*, without any work having been done; and guarantee a total minimum payment of $15 million regardless of the amount of work ultimately performed.

disclose" the results of any investigation, or whether "they wanna do it or anything else, just like any other client." *Id.* at 17-18.

After hearing Avenatti out, Wilson stated that the first demand, "settlement of Mr. Franklin's civil claims for 1.5 million dollars" would not "be the stumbling block here." *Id.* at 18. As to the second demand, however, Wilson asked if there were "a way to avoid your press conference without hiring you and [Geragos] to do an internal investigation?" *Id.* Again, Avenatti was dismissive: "I'm not gonna answer that question." *Id.* When Wilson explained that he was asking if everything could be done under a settlement agreement without Nike retaining Avenatti and Geragos to conduct an internal investigation, Avenatti rejected the idea of Nike making any greater payment to Franklin: "I don't think that it makes any sense for Nike to be paying, um, an exorbitant sum of money to Mr. Franklin, in light of his role in this." *Id.* at 20.

Later in the meeting, Avenatti stated that if Nike "wants to have one confidential settlement agreement—and we're done, they can buy that for 22 and a half million dollars," *id.* at 24, a number he would later characterize as "magical," *id.* at 28. Assuring Nike that it could structure such a payment to ensure that it was "[f]ully confidential," Avenatti promised his own "assistance . . . as it relates to Mr. Franklin." *Id.* at 25. Avenatti then confirmed Wilson's understanding that Nike could now consider "two scenarios": "There's the 1.5, plus the internal investigation and the parameters you [*i.e.*, Avenatti] described or 22[.5]." *Id.* at 28.

Avenatti proceeded to rework the original draft settlement agreement, giving Wilson a copy that, instead of providing for Nike

15

to transfer $1.5 million "to an account designated by Franklin's counsel," provided for the insertion of a yet-to-be-specified amount for such transfer. Gov't Ex. 205 ¶ 1.1.

Warning Wilson not to underestimate how badly he could injure Nike "if we don't reach a resolution," Avenatti stated that once he held a press conference, "this will snowball," with "parents, and coaches, and friends, and all kinds of people" contacting him,

> and every time we get more information, that's gonna be The Washington Post, The New York Times, ESPN, a press conference—and the company will die, not die, but they're going to incur cut after cut after cut after cut, and that's what's gonna happen. As soon as this thing becomes public. So, it is in the company's best interest to avoid this becoming public . . . .

Gov't Ex. 2T at 26-27.

As the meeting concluded, Avenatti stated that any agreement had to be finalized by the next Monday (March 25, 2019) or "we're done." *Id.* at 29.

### E. Events Leading to Avenatti's Arrest

In a telephone call later on March 21, Avenatti assured Franklin and Auerbach that things were "going well" but made no mention of the two options he had given Nike or of the action he intended to take as soon as the call concluded. Trial Tr. 1569. Specifically, after speaking with Franklin and Auerbach, Avenatti tweeted an article about the Adidas scandal and stated, "Something tells me that we have not reached the end of this scandal. It is likely far far broader than imagined." Gov't Ex. 106. When Franklin saw the tweet, he was

16

"very concerned and puzzled" as to why Avenatti would send such a communication if negotiations with Nike were "going well." Trial Tr. 1576.[13] Wilson, however, immediately recognized the tweet for what it was: a signal from Avenatti that he could "make good on the threats" to injure Nike if his demands were not promptly met. *Id.* at 350.

At approximately 11:54 a.m. on Monday, March 25, 2019, FBI agents arrived at Franklin's home. Franklin immediately called Avenatti who told him, "turn your phone completely off. And don't talk to them. I hope Nike is not trying to f--k you." *Id.* at 1579. Avenatti then said, "I'm going to go public," hanging up before Franklin could respond. *Id.* at 1580.

Avenatti proceeded to place several calls to *New York Times* reporter Rebecca Ruiz. *See* Gov't Ex. 702. Shortly after noon, he tweeted announcement of a press conference:

Tmrw at 11 am ET, we will be holding a press conference to disclose a major high school/college basketball scandal perpetrated by @Nike that we have uncovered. This

---

[13] Franklin testified that at that point he understood Avenatti to be (1) asking Nike "to look into Carlton DeBose and Jamal James' actions"; (2) negotiating a "restitution settlement of a million dollars" for him; and (3) discussing renewal of Nike's "relationship" with Franklin, "sponsorship" of his team, and how he and Nike "were going to go to the authorities and report" past misconduct. Trial Tr. 1577. Avenatti had never raised the first and third points with Nike. Also, he had never spoken to Franklin about "holding a press conference," demanding an "internal investigation" of Nike, "asking Nike to hire him [*i.e.*, Avenatti] or make any types of payments to him," or "making a settlement for [Franklin] dependent on [Avenatti] being hired or paid by Nike." *Id.* at 1577-78.

17

criminal conduct reaches the highest levels of Nike and involves some of the biggest names in college basketball.

Gov't Ex. 107.

Auerbach viewed the tweet with "utter shock and horror," deeming it "[c]ompletely opposite" the goals Franklin had described to Avenatti because "you don't threaten, you don't hold press conferences with people you're trying to forge a positive relationship with." Trial Tr. 815. Immediately, Auerbach sent Avenatti a text message saying that the tweet was "very upsetting to say the least," and asking Avenatti to call him "before going public in any way." Gov't Ex. 310. Franklin was also "[v]ery, very upset" by Avenatti's tweet "[b]ecause this is not how I wanted things handled. Never wanted to go public or have any type of press conference at all." Trial Tr. 1584. Rather, he intended for the information he had provided Avenatti "to remain confidential." *Id.*

At 12:39 p.m., Avenatti was arrested by FBI agents in the vicinity of Boies Schiller's Manhattan office.

## II.     Conviction and Post-Conviction Proceedings

After a three-week trial, the jury found Avenatti guilty on each of the charged counts. The district court denied a renewed defense motion for acquittal based on insufficient evidence, and a motion for a new trial. *See* FED. R. CRIM. P. 29, 31; *United States v. Avenatti* (*Avenatti I*), No. 19-cr-373, 2021 WL 2809919 (S.D.N.Y. July 6, 2021).

On July 8, 2021, the court sentenced Avenatti to concurrent prison terms of 24 months on Count One, 30 months on Count Two, and 30 months on Count Three. It also imposed concurrent supervised release terms of one year on Count One, three years on

18

Count Two, and three years on Count Three, as well as a total special assessment of $300.

The court did not then rule on the government's request for a restitution award of $1 million to Nike under the MVRA.[14] Observing that Nike's submitted billing records had "been redacted in such a way [as] to make it impossible to determine whether the fees sought fall within the recoverable categories as set forth in *Lagos v. United States*, 138 S. Ct. 1684 (2018)," Sent'g Tr. 46, the district court "deferred" its "determination as to restitution" until October 8, 2021, pending further submissions by Nike and the parties, *id.* at 48; *see* July 15, 2021 Judgment 7.[15]

In fact, it was not until seven months later, on February 18, 2022, that the district court entered an amended judgment of conviction ordering Avenatti to pay Nike $259,800.50 in restitution.[16] In a detailed memorandum and order, the district court rejected Avenatti's argument that Nike was not a "victim" under the MVRA

---

[14] The government submitted that Nike was entitled to such an award based on attorneys' fees incurred "in connection with its cooperation with the Government's investigation and prosecution" of Avenatti. *United States v. Avenatti* (*Avenatti II*), No. 19-cr-373, 2022 WL 452385, at *2 (S.D.N.Y. Feb. 14, 2022) (internal quotation marks omitted); *see* 18 U.S.C. § 3663A(b)(4). Nike claimed "at least $1,705,116.45" in such fees, but initially sought restitution "only for $1 million," *Avenatti II*, 2022 WL 452385, at *3 n.2 (internal quotation marks omitted), subsequently reduced to $856,162, *see id.* at *4.

[15] In *Lagos*, the Supreme Court construed the MVRA to allow restitution for expenses incurred by victims of specified crimes in assisting "*government investigations and criminal proceedings*," but not private investigations. 138 S. Ct. at 1690 (emphasis added) (construing 18 U.S.C. § 3663A(b)(4)).

[16] *See infra* at 67-69 (discussing reason for delay).

and, therefore, not entitled to any restitution award. *See United States v. Avenatti* (*Avenatti II*), No. 19-cr-373, 2022 WL 452385, at *8 (S.D.N.Y. Feb. 14, 2022). Nevertheless, the district court concluded that only some of Nike's legal fees were recoverable under 18 U.S.C. § 3663A(b)(4), thus awarding the company approximately one-third of what it had sought in its supplemental filing. Nike does not appeal this decision. Only Avenatti appeals from the amended judgment.

## DISCUSSION

On this appeal, Avenatti challenges the district court's (1) denial of his Rule 29 motion for acquittal based on insufficient evidence as to all three counts of conviction, (2) refusal to give his proposed honest-services fraud instruction as to an attorney's duties to a client under California law, and (3) award of restitution to Nike. After careful review, we conclude that these challenges are meritless.

## I. Sufficiency of the Evidence

Avenatti argues that the trial evidence was insufficient to prove (1) the wrongfulness element of his extortion crimes, and (2) the *mens rea* and bribery elements of honest-services fraud. We review these preserved sufficiency challenges *de novo*, mindful that Avenatti faces a heavy burden because, as the Supreme Court has instructed and this court has repeatedly acknowledged, we must sustain the jury's verdict if, crediting every inference that could have been drawn in the government's favor and viewing the evidence in the light most favorable to the prosecution, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *accord United States v. Raniere*, 55 F.4th at 364. In applying this

20

standard, we "must analyze the evidence in conjunction, not in isolation, and apply the sufficiency test to the totality of the government's case and not to each element, as each fact may gain color from others." *United States v. Raniere*, 55 F.4th at 364 (internal quotation marks omitted). Further, we must respect that "the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court." *Id.* (internal quotation marks omitted).

Following these principles here, we conclude that the trial evidence was sufficient to support Avenatti's conviction on each count of conviction.

### A. The Extortion Crimes

### 1. The "Wrongfulness" Element

Avenatti's convictions for transmission of interstate communications with intent to extort, *see* 18 U.S.C. § 875, and attempted extortion, *see id.* § 1951, required proof that he *wrongfully* threatened to harm Nike. This wrongfulness element is explicit in the text of § 1951(b)(2). *See id.* ("The term 'extortion' means the obtaining of property from another, with his consent, induced by *wrongful* use of . . . fear . . . ." (emphasis added)). This court has construed § 875(d) also to require proof of wrongfulness. *See United States v. Jackson* (*Jackson I*), 180 F.3d 55, 70 (2d Cir. 1999) (holding that § 875(d) incorporates "traditional concept of extortion, which includes an element of wrongfulness"). Because *Jackson I* and its successor case, *United States v. Jackson* (*Jackson II*), 196 F.3d 383 (2d Cir. 1999), provide useful guidance as to the wrongfulness element of extortion, we discuss these cases at the outset before turning to Avenatti's particular sufficiency challenge.

21

### a.    *Jackson I*

In *Jackson I*, the defendant claimed to be the unacknowledged child of an entertainment celebrity.  When she threatened to sell her paternity story to a tabloid journal unless the celebrity paid her $40 million, the defendant was charged with, and ultimately convicted of, extortion in violation of § 875(d).  This court reversed, identifying charging error in the district court's failure to instruct the jury as to wrongfulness.  We explained that "a threat to cause economic loss is not inherently wrongful"; rather, "it becomes wrongful only when it is used to obtain property to which the threatener is not entitled." *Jackson I*, 180 F.3d at 70.  Thus, "the objective of the party employing fear of economic loss or damage to reputation will have a bearing on the lawfulness of its use, and . . . it is material whether the defendant had a claim of right to the money demanded."  *Id.*  Put another way, when a party threatens harm to demand property to which he has no claim of right, the threat is extortionate.

But, as *Jackson I* went on to note, even when a party demands property to which he has a claim of right, the threat used to support the demand can be extortionate if the threat itself lacks a nexus to the claim of right.  *See id.* (holding "threat to reputation that has no nexus to a claim of right" to be "inherently wrongful").  To illustrate, *Jackson I* considered two hypotheticals: (1) a consumer's demand for compensation for injuries caused by a defective product, and (2) a club's demand for members to pay outstanding dues.  *See id.* at 70-71.  In both scenarios, the demands bear the requisite nexus to claims of right, the first in tort, the second in contract.  Thus, when the demands are supported by threats that also bear a nexus to the claims of right—

22

*e.g.*, the injured purchaser's threat to lodge a complaint with a consumer protection bureau or the club's threat to publish a list of members who owe dues—there is no wrongfulness and, therefore, no extortion. *See id.* at 71. But if these same demands are supported by threats lacking such a nexus—*e.g.*, threats to disclose sexual indiscretions by the manufacturer's president or the delinquent club member—then, even though the demands relate to a claim of right, the threats are wrongful and extortionate.

In sum, *Jackson I* instructs that "where a threat of harm to a person's reputation seeks money or property to which the threatener does not have, and cannot reasonably believe she has, a claim of right, *or* where the threat has no nexus to a plausible claim of right, the threat is inherently wrongful." *Id.* (emphasis added). As this quoted language shows, Avenatti is mistaken in reading *Jackson I* to require only "a nexus between the *threat* and the claim, not the *demand* and the claim" to avoid conviction for extortion. Appellant Br. 44 (emphases in original). The wrongfulness element is satisfied if either the demand or the threat supporting that demand lacks a nexus to a claim of right.

### b. *Jackson II*

The day after this court announced its decision in *Jackson I*, the Supreme Court ruled that "the omission of an element [from a jury charge] is subject to harmless-error analysis." *Neder v. United States*, 527 U.S. 1, 15 (1999). Accordingly, we agreed to rehear *Jackson I* to determine whether the district court's failure to charge the wrongfulness element of extortion was harmless. *See Jackson II*, 196 F.3d at 386-87.

23

In concluding that the omission was harmless, *Jackson II* reiterated that a threat to harm reputation if a demanded payment is not made is wrongful "only if the defendant has no plausible claim of right to the money demanded *or* if there is no nexus between the threat and the defendant's claim." *Id.* at 387 (emphasis added). Nevertheless, we held the failure to give a wrongfulness instruction in that case harmless because the evidence plainly demonstrated that neither the money demanded nor the threat supporting that demand related to a claim of right.

Focusing first on the demand, *Jackson II* concluded as a matter of law that the defendant's monetary demand did not relate to a plausible claim of right to child support because it was "utter[ly] implausib[le] that a court would order a child support payment in a sum even remotely approaching the many millions of dollars demanded." *Id.* at 388. This clarified that a party with a plausible claim of right to *some* payment may nevertheless commit extortion when, by threat of reputational harm, he demands a payment far in excess of any amount that the claim will plausibly support.[17]

As to threat, *Jackson II* observed that, even if the defendant had a plausible claim of filial right, she could not demonstrate the requisite nexus between that right and her threat because "the commencement of a paternity suit was not the right Jackson sought to sell. Rather, she demanded money in exchange for not giving her

---

[17] *Jackson II* also concluded as a matter of law that defendant had no plausible inheritance right claim because that would require the celebrity father to be deceased when he was, in fact, very much alive. *See* 196 F.3d at 387.

story to *The Globe*, though the publication of her story neither would establish paternity nor was a prerequisite to a paternity suit." *Id.* In these circumstances, this court concluded as a matter of law that the defendant's demand was "inherently wrongful" because the threat to disclose the defendant's paternity to a tabloid journal had no potential on its own to secure any payment to which she had a claim of right from the celebrity father. Rather, the "threat to disclose was the only leverage [the defendant] had to extract money from him"; once she actually acted on that threat by making the disclosure, the defendant "would lose that leverage." *Id.* at 388-89 (quoting *Jackson I*, 180 F.3d at 71).

The principles enunciated in *Jackson I* and *Jackson II* thus signal that, in the context of a reputational threat, the wrongfulness element of extortion requires consideration of both the demand made and the threat used to support it. If each bears a nexus to a claim of right, the threat is not wrongful as required to constitute extortion. But if there is no nexus between a claim of right and either the thing demanded or the reputational threat used to support that demand, then the threat is wrongful and extortionate. *See United States v. Farooq*, 58 F.4th 687, 693 (2d Cir. 2023) (so applying *Jackson I* test).

In applying these principles here, we note that in this case, unlike in *Jackson*, the jury was properly charged as to the wrongfulness element of extortion. Thus, we need not decide, as in *Jackson II*, whether the evidence compelled a finding of wrongfulness as a matter of law. Rather, on Avenatti's sufficiency challenge, we need decide only whether any rational jury could find wrongfulness on the evidence presented viewed in the light most favorable to the

prosecution. *Compare Jackson v. Virginia*, 443 U.S. at 319 (discussing sufficiency standard), *with Neder v. United States*, 527 U.S. at 15 (discussing harmless-error standard).

### 2. The Evidence Was Sufficient To Prove Wrongfulness

Avenatti's sufficiency challenge to the extortion counts of conviction fails because the evidence, viewed in the light most favorable to the prosecution, permitted a reasonable jury to conclude that he had no claim of right to a personal payment from Nike, let alone to a $15-25 million payment as distinct from a $1.5 million payment to his client Franklin. Further, to the extent Avenatti sought to secure his $15-25 million demand through an agreement whereby Nike would retain Avenatti and Geragos to conduct an internal investigation, there is no evidence that the men had any plausible claim of right to be hired by the company for that purpose.[18] In the absence of a plausible personal claim of right, there is nothing to which Avenatti's demand or threat can have a nexus.

Avenatti advances several arguments in urging a contrary conclusion. None persuades.

### a. Avenatti's Retainer Demand Bore No Nexus to Franklin's Claim of Right

Avenatti argues that his retainer demand was not extortionate because it bore the requisite nexus to his client Franklin's claim of

---

[18] While Avenatti's retainer demand pertained to himself and Geragos, for ease of reference, we hereafter reference it only as it pertains to Avenatti.

right against Nike in that Avenatti's retention "aligned with Franklin's objectives." Appellant Br. 34. Even if we assume *arguendo* that Franklin had a claim of right (whether in tort or contract), Avenatti's argument would fail because it required the jury to find that he (1) reasonably believed that his retainer demand served Franklin's claims, and (2) intended to pursue a *bona fide* internal investigation of Nike. Because the evidence does not compel either conclusion, we must assume that the jury did not so find.

### i. There Was No Reasonable Belief that the Retainer Demand Served Franklin's Goals

To begin, the evidence sufficed to permit a reasonable jury to conclude—as Nike's own outside counsel had—that Avenatti, in soliciting a multi-million-dollar retainer agreement with Nike, was operating in conflict with, rather than in pursuit of, Franklin's interests. *See supra* at 10 n.6.[19] In urging otherwise, Avenatti suggested at oral argument that his representation of Nike would not have commenced until the conclusion of his representation of Franklin. *See* Oral Arg. Tr. 14. But that assertion is in tension with his briefed contention that he reasonably believed that retention by Nike

---

[19] Having recounted the trial evidence in some detail in the Background section of this opinion, and there provided citations to the record, we here simply cite to that Background section where possible when quoting or discussing evidence pertinent to Avenatti's arguments.

would allow him to continue to serve Franklin's goals. *See* Appellant Br. 34-35.

In any event, because the demanded internal investigation risked exposing misconduct by Franklin as well as Nike, Avenatti would necessarily be laboring under a continuing conflict of interest.[20]  This is evident from the fact that Avenatti assured Nike that it alone would decide what to do with the results of his internal investigation, *see supra* at 16, but secured no such protection for Franklin, who was never told of the retainer demand.  On this record, the jury was not compelled to find that Avenatti reasonably believed that his retainer demand aligned with Franklin's objectives.  Instead, a reasonable jury could have concluded that the demanded retainer would do so little to further Franklin's goals that Avenatti could not reasonably have thought that his retainer demand served that purpose.  That conclusion is evident when we consider Franklin's goals as revealed to Avenatti.

We begin with one goal that Avenatti did pursue: Franklin's wish to be compensated for injuries to himself and Cal Supreme.  Trial evidence showed that Nike's sponsorship agreement with Cal

---

[20] *See* CAL. R. PROF. CONDUCT 1.7(b) (West 2023) ("A lawyer shall not, without informed written consent . . . represent a client if there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client . . . or by the lawyer's own interests."); *see also* CAL. BUS. & PROF. CODE § 6068(e)(1) (West 2023) (requiring attorney "[t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client"); CAL. R. PROF. CONDUCT 1.6(a) (prohibiting lawyer from revealing information protected by Business and Professions Code § 6068(e)(1)).

Supreme had an annual value of $192,000, approximately $30,000-35,000 of which Franklin kept as salary. Evidence also showed that Nike was willing to pay Franklin $1.5 million, *see supra* at 16—an amount seemingly satisfactory to him, *see* Trial Tr. 1577. Unbeknownst to Franklin, however, Avenatti refused to settle Franklin's claims for $1.5 million unless Nike *also* guaranteed Avenatti a multi-million-dollar retainer. Indeed, he repeatedly threatened to walk away from negotiations unless he was guaranteed such a retainer. *See supra* at 13, 16-17. From the totality of this evidence, a reasonable jury could have concluded that Avenatti's retainer demand was more of an obstacle to, rather than a means for, achieving Franklin's compensation goal and, thus, that Avenatti did not demand a retainer to serve Franklin's goals, but only to secure a multi-million-dollar payoff for himself.

A second Franklin goal was to have Nike employees James and DeBose fired. Although Avenatti specifically told Franklin he would pursue this goal, *see supra* at 9, the evidence shows that he never once raised it in negotiations with Nike. Nor was the jury compelled to conclude that Avenatti thought that he needed to conduct a multi-million-dollar internal investigation before he could reasonably request such firings. Evidence showed that Franklin had already given Avenatti documentary proof of misconduct by these employees. *See* Gov't Exs. 305, 308. It also showed that in demanding a retainer, Avenatti did not insist that Nike agree to discipline or discharge those employees exposed as corrupt by his internal investigation. To the contrary, he repeatedly assured Nike that, in acceding to his retainer demand, the company would not have to do anything with the results of his investigation. *See supra* at 16. Indeed,

the only thing the demanded retainer would require Nike to do was to pay Avenatti $12 million, deemed earned when paid, and guarantee him a total minimum payment of $15 million. *See supra* at 15. This was sufficient evidence for a reasonable jury to conclude that Avenatti did not demand a retainer agreement in order to get James and DeBose fired.

Franklin identified two goals as particularly important to him: (1) maintaining a relationship with Nike, and (2) getting to coach his team again ("the most important thing"). *Supra* at 6. While Avenatti told Franklin that he thought their attainment—particularly the second—was unlikely, he never told his client that he planned to concede them outright, as he did when he told Nike representatives "as a matter of fact, that Gary Franklin, his client, would never be able to work with Nike again." Trial Tr. 1431. Viewing this evidence in the light most favorable to the prosecution, a reasonable jury could conclude that Avenatti, far from believing that his retainer demand would serve Franklin's two most important objectives, deliberately abandoned these goals in pursuing a multi-million-dollar payment for himself. Indeed, the conclusion is only reinforced by evidence showing that, in March 2019, Avenatti had a pressing personal need for over $11 million. *See supra* at 7.

When considered in light of Avenatti's failure to pursue Franklin's goals, his other actions also support a jury finding that he did not reasonably believe that his retainer demand aligned with Franklin's goals. Specifically, what Avenatti threatened to disclose if his demand was not met was information that Franklin considered, and had sometimes even expressly marked, confidential. *See supra* at

6, 9, 19. For this reason alone, Avenatti fails convincingly to analogize his threatened disclosure to the hypotheticals in *Jackson I*. *See supra* at 23-27. Indeed, Avenatti's threatened disclosure not only breached client confidence, but also exposed Franklin, his former players, and their families to serious reputational—and possibly legal—harm. Franklin testified that this was precisely why *he* was "not at all" interested in making his experiences with Nike public: "I didn't want to, you know, hurt Nike's reputation, didn't want to hurt any of the kids' reputations or the parents. I didn't want to hurt my reputation or the program's reputation." Trial Tr. 1536-37. The evidence, however, showed Avenatti ignoring these concerns in pursuit of his own enrichment. Thus, when Wilson, in urging Avenatti to give Nike more than a day to consider his demands, suggested that public disclosure might hurt Franklin's former players, Avenatti replied, "I don't give a f--k about those kids," and stated that delay would hurt *him*—not his client Franklin—in bargaining with Nike. *Supra* at 12 & n.9. This evidence provided a solid basis for the prosecution to argue—and for the jury to conclude—that Avenatti's threat of public disclosure showed that he did not reasonably believe that his retainer demand would serve Franklin's interests but, rather, recognized that it served only his own. *See, e.g.*, Trial Tr. 2139-40 (arguing, "Avenatti didn't care that a press conference would mean accusing his own client of being involved in potentially criminal activity. . . . He cared about getting paid."); *id.* at 2276 (arguing, "Gary Franklin told you why he does what he does. . . . The kids. . . . Michael Avenatti did not care. . . . It's OK for him not to personally care. It is not OK for him to ignore the fact that his client cares. And he knew it.").

In sum, the evidence did not compel a jury finding that Avenatti demanded a $15-25 million retainer from Nike because he reasonably believed that it served Franklin's interests. Rather, the evidence sufficed to support a jury finding that the demand was pursued only to enrich Avenatti and, thus, that it lacked the necessary nexus to Franklin's own claim of right to preclude a finding of wrongfulness.

### ii. There Was No Intent To Conduct a *Bona Fide* Investigation

Avenatti's nexus argument also assumes his intent to conduct a *bona fide* internal investigation of Nike, one that he fairly valued at $15-25 million. The evidence not only did not compel that conclusion, but also convincingly supported a contrary one.

Whether a payment demand made under threat of harm is extortionate depends not only on whether a party has a claim of right to *some* amount of money, but also on whether he has a plausible claim of right to the amount of money demanded. A plausibility standard does not contemplate exacting scrutiny of a claim's value. Nevertheless, where it is "utter[ly] implausib[le]" that a claim of right could yield an award in the amount demanded, the nexus necessary to preclude a jury finding of extortion is lacking. *Jackson II*, 196 F.3d at 388 (assuming defendant's claim of right to filial support, holding it "utter[ly] implausib[le]" that court would order support in amount remotely approaching $40 million demand). Avenatti claims that he reasonably demanded a $15-25 million retainer to conduct an internal investigation of Nike based on the $10-20 million amount Nike's

outside counsel "would have charged" for such work.  Reply Br. 17.
The jury, however, was not compelled to accept this argument,
having heard Wilson state that he had never received a $10 million
retainer from Nike, and having heard Avenatti repeatedly press for a
concession as to the possibility of an internal investigation costing in
excess of $10 million.  *See supra* at 14-15.  We need not pursue the point
further, however, because when the retainer amount is considered
together with other evidence favorable to the prosecution, we must
conclude that a reasonable jury could have found that Avenatti
demanded this money not as fair compensation for a *bona fide* internal
investigation of Nike, but as a payoff for his own silence.[21]

Specifically, evidence shows that in demanding a $15-25
million retainer, Avenatti provided Nike with only the briefest
description of its scope, and with nothing about the necessary work
anticipated to conduct a proper investigation, the number of persons
or amount of time likely to be required, or how the work would be
tracked and reported.  *See supra* at 15.  Instead, Avenatti's focus in
demanding the retainer was on how much and how quickly he would
be paid.  From the start, he made clear that a retainer amount of less

---

[21] Although the amount of Avenatti's demand was not determinative of
extortion, *see* Trial Tr. 1288-89 (government's argument); *id.* at 2330 (district
court's instruction), it was some evidence of his intent to the extent the
demand was untethered to any claim of right, *see id.* at 1289 (arguing
"amount is evidence of his intent because it was not tethered to anything");
*id.* at 1292 (observing, in overruling defense objection, that if person says he
"want[s] $25 million and there is no discussion of how many lawyers are
going to work on it, what their billing rates are going [to be], how many
interviews . . . then the government is entitled to argue this was a number
pulled out of the air").

than $10 million would not be sufficient for him to abandon his public disclosure threat. As he told Nike in dismissing the possibility of a retainer in a lesser amount, "it's worth more in exposure to me to just blow the lid on this thing." *Supra* at 12. In short, a below-$10 million retainer was not inadequate because of the time and effort anticipated to conduct a *bona fide* internal investigation. Rather, it was inadequate value for what Avenatti was really selling: the threatened press conference.[22]

The jury heard this for itself on the March 21, 2019 recording where Avenatti describes the particularly vulnerable position in which he held Nike by virtue of his ability to hold a press conference that would "take 5, 6 billion dollars in market cap off" the company. *Supra* at 14. Avenatti tells Wilson that compared to that damage, his $15-25 million retainer demand is not "a lot of money in the grand scheme of things." *Id.* Wilson, in turn, shows that he perfectly understands what Avenatti is selling and questions only the price: "I've seen some press conferences in my day, I've seen some of your press conferences, I'm not sure I've seen a 25 million dollar press conference." Gov't Ex. 2T at 24. Avenatti does not disabuse Wilson of his understanding of the product being sold. He clarifies only the number: "This is not gonna be a single press conference." *Id.* Matters will "snowball," and as Avenatti receives more information, he will hold more press conferences with the net result that Nike will "incur cut after cut after cut after cut." *Supra* at 16. For this reason, Avenatti

---

[22] Avenatti was also selling Nike his influence with Franklin, a point we pursue *infra* at 41-52 in considering Avenatti's challenge to his conviction for honest-services fraud.

states, "it is in the company's best interest to avoid this becoming public," something it can do only by agreeing to his retainer demand. *Id.*[23]

The terms of that demand further support the conclusion that Avenatti did not intend to conduct a *bona fide* investigation. Nike would be obligated to pay Avenatti $12 million upon signing the retainer agreement *and* to deem that amount earned when paid, *i.e.*, earned before Avenatti conducted any investigation. Further, Nike would have to guarantee Avenatti a total minimum payment of $15 million, no matter how little work he did on an investigation. When these terms are considered together with the quoted evidence of negotiations, a reasonable jury could conclude that Avenatti did not demand a $15-25 million retainer because he intended to conduct a *bona fide* internal investigation of Nike, much less do so in furtherance of his client Franklin's objectives. Rather, the jury could conclude that the demanded retainer agreement was merely a vehicle for extorting millions of dollars from Nike not to hold a press conference that would not only embarrass the company but also cause "billions" of dollars' damage to its market value.

In short, sufficient evidence permitted a reasonable jury to find that there was no nexus between a claim of right by Franklin and

---

[23] Insofar as Avenatti tells Wilson that Nike is "gonna have to self-report," Gov't Ex. 2T at 27, the jury was not compelled to conclude therefrom that Avenatti intended to conduct a *bona fide* investigation for the demanded multi-million-dollar retainer. Rather, the evidence permitted a reasonable jury to conclude that the retainer was simply the vehicle that Avenatti offered Nike to buy his silence on a threat to injure the company's market position.

Avenatti's multi-million-dollar retainer demand and, thus, to find the wrongfulness necessary to extortion.

### b. Avenatti's $22.5 Million Demand Bore No Nexus to Franklin's Claim of Right

Avenatti argues that, even if his retainer demand lacks the requisite nexus to Franklin's claim of right, his March 21, 2019 alternative proposal for an outright settlement of $22.5 million satisfies that requirement. This argument also fails to persuade.

*First*, Avenatti's wire communication of an extortionate threat was completed on March 20, 2019, before Avenatti made this alternative offer on March 21. Thus, that later offer is irrelevant to the sufficiency of proof as to Count One.

*Second*, even as to Avenatti's attempted Hobbs Act extortion, the subject of Count Two, the evidence shows that Avenatti did not withdraw his extortionate $15-25 million retainer demand on March 21. He only offered an alternative to it. Thus, a reasonable jury could have found that Avenatti was still trying to extort a multi-million-dollar payment from Nike for himself.

*Third*, Avenatti's argument assumes that the demanded $22.5 million (or at least the bulk of it) was destined for Franklin. The evidence did not compel the jury to reach that conclusion; rather it could reasonably have concluded that the money was destined largely for Avenatti. The $22.5 million number that Avenatti described as "magical," *supra* at 15, is the sum of $1.5 million (the amount long destined for Franklin) plus $21 million (slightly above the midpoint of Avenatti's $15-25 million retainer demand). From

36

this, the jury could reasonably have inferred that the $22.5 million demand was just a different way of packaging the retainer demand to achieve the same relative payoffs for Avenatti and Franklin, albeit somewhat more generously and quickly for Avenatti.

In urging otherwise, Avenatti argues that because Franklin would have had to sign a final settlement agreement, he would necessarily have learned the $22.5 million number. But the jury also was not compelled to reach that conclusion. The revised agreement that Avenatti prepared on March 21, 2019, left the settlement number blank. Moreover, it provided for any payments to go to "an account designated by Franklin's counsel." *Id.* Thus, a reasonable jury could have concluded that, just as Avenatti had used a retainer agreement as the vehicle for him to receive millions of dollars from Nike without Franklin knowing it, Avenatti would have arranged to receive the bulk of a $22.5 million settlement also without Franklin knowing, much less receiving, it. For all these reasons, the jury was not compelled to find a nexus between the alternative $22.5 million demand and Franklin's claim of right so as to preclude a finding of wrongfulness.

### c. Avenatti's Demands Bore No Nexus to a Claim of Right to Attorneys' Fees

Avenatti argues that even if he was "acting out of self-interest and had no intention of conducting a real investigation—so that his demand was, in essence, a request for his own fees—that did not make it wrongful for purposes of the federal criminal extortion statutes." Appellant Br. 39. In thus suggesting that he had a personal

claim of right to fees distinct from any claim of Franklin's, Avenatti submits that California law permits an attorney simultaneously to negotiate settlement of a client's claims and compensation of his own fees, despite the conflict of interest between attorney and client in those circumstances. *See Ramirez v. Sturdevant*, 26 Cal. Rptr. 2d 554, 564-66 (Ct. App. 1994). The problem with this argument is that the evidence did not compel a jury to find that Avenatti's self-interested pursuit of a retainer agreement with Nike was, in fact, a request for his own fees.

While California law sometimes permits an attorney simultaneously to negotiate a settlement of his client's claims and his own fees, the fees for which he may thus negotiate are those incurred in representing that client. *See id.* Here, no record evidence suggests that Avenatti, in demanding a retainer agreement with Nike, was asking the company to cover fees earned representing Franklin in his dispute with Nike. To the contrary, Avenatti told Nike that by entering into the demanded retainer, the company would become Avenatti's "client," implying—at best—that the retainer would cover Nike's future fees, not Franklin's incurred ones. *Supra* at 14. Further, whatever claim of right Avenatti might have had to fees already earned representing Franklin in negotiations with Nike, a reasonable jury could conclude that they were not the subject of the demanded retainer agreement because it was "utter[ly] implausib[le]" that such fees had reached an amount "even remotely approaching the many

38

millions of dollars demanded" by Avenatti. *Jackson II*, 196 F.3d at 388.[24]

Insofar as Avenatti suggests the demanded retainer was intended to compensate for anticipated future "fees" representing Nike, he points to no law or case in which California—or any other state—excuses the conflict of interest inherent in an attorney negotiating a settlement on behalf of one client while simultaneously soliciting future legal business from the client's adversary. Indeed, when as here the solicited future business is an investigation posing risks for the initial client (Franklin), California law specifically prohibits the solicited representation absent the initial client's informed written consent. *See supra* at 28 n.20 (quoting relevant sections of California law).[25] No matter. Even if it were ethically permissible for Avenatti to negotiate a settlement for his client

---

[24] The record is devoid of evidence as to Avenatti's billing rates or the precise time he spent on Franklin's behalf. Nevertheless, it shows that Avenatti first spoke with Geragos about Franklin's concerns on March 1, 2019, and that Avenatti was arrested on the morning of March 25, 2019. Even assuming what is highly unlikely—that the two men worked 24 hours a day for those 25 days (*i.e.*, 25 x 24 x 2 = 1,200 hours), each billed $1,000 per hour (*i.e.*, 1,200 x $1,000 x 2 = $2,400,000), and had $250,000 each in expenses (*i.e.*, $250,000 x 2 = $500,000)—that totals $2,900,000, nowhere near the $12 million for which the demanded retainer would have required immediate payment (deemed earned when paid) or the guaranteed total $15 million minimum payment. Nor is there evidence of any other rational fee arrangement—*e.g.*, contingency—that would support such an extraordinary payment.

[25] Given Avenatti's failure ever to mention his retainer demand to Franklin, and his plan to document the retainer separately from Franklin's settlement and release, a reasonable jury could conclude that Avenatti did not intend to secure Franklin's informed consent.

Franklin against Nike while at the same time soliciting his own retainer by Nike, as we have already stated, that does not support a "claim of right" by Avenatti to fees not yet earned or to payments under a retainer agreement not yet finalized. *See supra* at 27-28.

Moreover, the evidence did not compel a finding that Avenatti's demand for either a $15-25 million retainer or a $22.5 million payment was aimed at securing compensation for *any* legal fees earned representing Nike. For reasons already discussed, the evidence supported a jury finding that Avenatti never intended to conduct a *bona fide* internal investigation of Nike or to perform any other legal work for the company. *See supra* at 32-35. Rather, the evidence admitted a finding that what Avenatti was selling at the price of a $15-25 million retainer (or a $22.5 million payment) was his forbearance on a threat to publicize information so injurious to Nike's reputation that he predicted it would take "billion[s]" of dollars off the company's market value. *See supra* at 27-32. This threat bore no nexus to a personal claim of right by Avenatti, and certainly not to a claim of right to attorneys' fees. Indeed, once Avenatti acted on the threat, he would lose "the only leverage [he] had to extract" the millions of dollars from Nike that he demanded for himself. *Jackson II*, 196 F.3d at 388-89 (internal quotation marks omitted).

Thus, neither Avenatti's retainer demand nor the threat of harm with which he supported it bore a nexus to any personal claim of right to legal fees so as to preclude a jury finding of wrongfulness.

To summarize, we conclude that Avenatti's sufficiency challenge to the two extortion counts of conviction fails on the merits. The evidence, viewed in its totality and in the light most favorable to

40

the prosecution, was sufficient to permit a reasonable jury to find that neither Avenatti's $15-25 million retainer demand nor his $22.5 million alternative bore the requisite nexus to any claim of right that Franklin may have had. Moreover, the evidence was sufficient to permit a reasonable jury to find that neither those demands *nor* Avenatti's injurious-publicity threat bore the requisite nexus to any personal claim of right to seek attorneys' fees. Accordingly, the evidence was sufficient to support the finding of wrongfulness necessary to extortion.

## B. Honest-Services Fraud

Avenatti stands convicted of transmitting interstate wire communications in a scheme to defraud Franklin of his "intangible right" to Avenatti's "honest services" as his attorney in negotiations with Nike. 18 U.S.C. § 1346 (stating that term "scheme or artifice to defraud," as used *inter alia* in wire fraud statute, *see id.* § 1343, "includes a scheme or artifice to deprive another of the intangible right of honest services").

Honest-services fraud differs from traditional fraud. In traditional fraud, the victim's loss is the defendant's gain. *See Skilling v. United States*, 561 U.S. 358, 400 (2010) (stating that in traditional fraud, "victim's loss of money or property supplie[s] the defendant's gain, with one the mirror image of the other"). By contrast, in honest-services fraud, while "the offender profit[s], the betrayed party suffer[s] no deprivation of money or property; instead, a third party, who ha[s] not been deceived, provide[s] the enrichment." *Id.*

In *Skilling*, the Supreme Court rejected a facial vagueness challenge to § 1346 honest-services fraud. *See id.* at 402-05. In doing

41

so, however, the Court clarified that honest-services fraud does not reach all "undisclosed self-dealing," *i.e.*, action taken to further one's "own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Id.* at 409 (internal quotation marks omitted). Rather, to be guilty of honest-services fraud, a defendant acting "in violation of a fiduciary duty" must have engaged in a "bribery or kickback scheme[]." *Id.* at 407.[26] "[B]ribery is generally understood to mean the corrupt payment or offering of something of value to a person in a position of trust with the intent to influence his judgment or actions." *United States v. Ng Lap Seng*, 934 F.3d 110, 131 (2d Cir. 2019) (citing *Perrin v. United States*, 444 U.S. 37, 43-46 (1979) (tracing ordinary meaning of bribery to common-law origins)); *see also United States v. Quinn*, 359 F.3d 666, 674

---

[26] In reaching this conclusion, the Court traced the history of honest-services fraud before *McNally v. United States*, 483 U.S. 350 (1987) (rejecting concept of honest-services fraud and holding mail fraud statute limited to "protection of property rights," *id.* at 360), the case that triggered Congress's enactment of § 1346. The Court construed the definite article in the phrase "*the* intangible right to honest services," 18 U.S.C. § 1346 (emphasis added), to signal Congress's intent to cover the "core" of pre-*McNally* honest-services caselaw, which had, "[i]n the main . . . involved fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." *Skilling v. United States*, 561 U.S. at 404. The Court concluded that persons engaged in such schemes had sufficient notice of the unlawfulness of their conduct to avoid constitutional vagueness concerns. *See id.* at 412. Some years earlier, this court, sitting *en banc*, had also concluded that the fiduciary breach entailed in paying or soliciting bribes fell "squarely within the meaning of 'scheme or artifice to deprive another of the intangible right of honest services' as distilled from the pre-*McNally* private sector cases." *United States v. Rybicki*, 354 F.3d 124, 142 (2d Cir. 2003) (*en banc*) (rejecting vagueness challenge based on lack of notice).

(4th Cir. 2004) (affirming solicitation-of-bribery conviction because, although no bribe was paid, defendants "sought . . . a thing of value with the corrupt intent of being influenced in the performance of an official act"). "It is this *quid pro quo* element," *i.e.*, the "'specific intent corruptly to give [or in the case of solicitation, receive] something of value *in exchange*' for action or decision that distinguishes bribery from the related crime of illegal gratuity." *United States v. Ng Lap Seng*, 934 F.3d at 132 (brackets omitted) (quoting *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404-05 (1999) (emphasis in original)). Thus, following *Skilling*, this court has held that for conduct to constitute honest-services fraud, it "must involve a quid pro quo, *i.e.*, an 'intent to give or receive something of value in exchange for an . . . act.'" *United States v. Nouri*, 711 F.3d 129, 139 (2d Cir. 2013) (ellipses in original) (quoting *United States v. Bruno*, 661 F.3d 733, 743-44 (2d Cir. 2011)).

Avenatti argues that the trial evidence was insufficient to prove the *quid pro quo* required to satisfy the bribery element of honest-services fraud. He also raises a sufficiency challenge to the proof of fraudulent intent. Record evidence defeats both arguments.[27]

---

[27] *Ciminelli v. United States*, 143 S. Ct. 1121 (2023), and *Percoco v. United States*, 143 S. Ct. 1130 (2023), recent Supreme Court decisions cited to us after argument by Avenatti, do not pertain to his challenges. *See* Appellant's May 16, 2023 28(j) Letter. At issue in *Ciminelli* was traditional, not honest-services, fraud. Thus, its rejection of a "right-to-control theory" of "property" for purposes of satisfying the loss-of-property element of traditional fraud, *see* 143 S. Ct. at 1127, has no bearing on Avenatti's sufficiency challenge to his conviction for honest-services fraud.

### 1. *Quid Pro Quo*

Avenatti submits that even if the multi-million-dollar retainer he solicited from Nike satisfied the *quid* requirement for bribery, there was no evidence to prove the requisite *quo* because he never offered to take any action favorable to Nike in return. Instead, he offered only *in*action, specifically, forbearance on his threat of public disclosure of Nike's misdeeds.

In reversing an honest-services fraud conviction in *Percoco*, the Supreme Court ruled that a jury instruction, derived from *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982), was unconstitutionally vague in stating the standard for determining when a private person owes a fiduciary duty to the public. *Percoco v. United States*, 143 S. Ct. at 1138 (identifying error in instruction that defendant owed duty of honest services to public if (1) "he dominated and controlled any governmental business," and (2) "people working in the government actually relied on him because of a special relationship he had with the government," *id.* at 1135 (internal quotation marks omitted)). No fiduciary duty to the public is at issue in this case, and Avenatti does not—and cannot—argue that he lacked notice that, as an attorney, he owed a fiduciary duty to his client. *See United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) (describing attorney-client relationship as "hornbook fiduciary relation[ship]").

Insofar as Avenatti points us to *Percoco*'s reiteration of *Skilling*'s ruling that "undisclosed self-dealing" does not constitute honest-services fraud, Appellant's May 16, 2023 28(j) Letter 2 (quoting *Percoco v. United* States, 143 S. Ct. at 1137), the district court specifically so charged the jury and instructed that Avenatti could be found guilty of honest-services fraud only if the government "prove[d] beyond a reasonable doubt that [he] solicited a bribe from Nike in the course of his representation of Mr. Franklin in exchange for which he offered to take actions regarding the settlement of Mr. Franklin's claims." Trial Tr. 2342. Thus, in text, we discuss why the evidence was sufficient to permit a reasonable jury to conclude that Avenatti had so acted.

44

We need not here decide whether demanding a payment in return for forbearing on a threat to harm can ever, by itself, satisfy the *quid pro quo* requirement for bribery.[28]  The evidence in this case, viewed in the light most favorable to the prosecution, shows Avenatti offering to do more than forbear on his threat to injure Nike through public disclosure.  It shows Avenatti also offering to take action, specifically, to use his particular influence as Franklin's attorney to have his client settle his potential claims against Nike for receipt of $1.5 million, but only if Nike guaranteed a multi-million-dollar payment to Avenatti himself.  In short, the *quo* Avenatti offered Nike was "'to disregard his duty'" to Franklin "while continuing to appear devoted to it" in advising him to accept a settlement that would enrich Avenatti far more than Franklin.  *United States v. Ng Lap Seng*, 934 F.3d at 131 n.24 (quoting *United States ex rel. Sollazzo v. Esperdy*, 285 F.2d 341, 342 (2d Cir. 1961) ("Bribery in essence is an attempt to influence another to disregard his duty while continuing to appear devoted to it or to repay trust with disloyalty.")).

In urging otherwise, Avenatti argues that a $1.5 million payment to Franklin would have realized more for the client than the $1 million Avenatti had promised to obtain for him.  The argument fails because a person need not suffer economic harm to have been denied the honest services of a fiduciary.  *See generally United States v. Tanner*, 942 F.3d 60, 65 (2d Cir. 2019) (stating that government was not required to prove that defendant's acts "caused or were intended to

---

[28] *See generally Evans v. United States*, 504 U.S. 255, 267 n.18 (1992) (recognizing possibility of charging extortion and bribery based on same conduct in some contexts and of such charges being "mutually exclusive" in other contexts).

cause . . . financial harm" to company owed fiduciary duty; "it needed to prove only that [company] lost its right to [fiduciary's] honest services at least in part because of [third party's] bribes and kickback").

Here, the evidence showed that, at the same time Avenatti demanded a $1.5 million payment for Franklin, he was abandoning other objectives that he had told Franklin he would pursue, *e.g.*, getting James and DeBose fired, *see supra* at 29-31, and, instead, demanding a multi-million-dollar retainer for himself, *see supra* at 32. Moreover—without ever telling Franklin—Avenatti conditioned acceptance of a $1.5 million payment for his client on Avenatti's receipt of the demanded retainer. In this way, he not only leveraged his client's claim to his own advantage but also effectively held Franklin's acceptance of a $1.5 million settlement hostage to Avenatti's personal receipt of a larger payout. When Nike expressed a willingness to pay more in settlement to Franklin if it could avoid the demanded retainer, Avenatti rejected out of hand the possibility of a higher payment for his client at Avenatti's own expense.

On this record, a reasonable jury could have found that in negotiating with Nike, Avenatti was not serving Franklin's interests, but rather using them to enrich himself. That, in turn, supported a finding that, in return for Nike agreeing to Avenatti's own payment demand, Avenatti offered to use his influence with the unwitting Franklin to have him accept $1.5 million in settlement of his claims.

Avenatti most clearly offered this *quo* at the March 21, 2019 meeting. In making an alternative demand for a one-time payment of $22.5 million—which the jury could reasonably have concluded

46

was destined mostly for Avenatti, *see supra* at 36-37—he offered his "assistance . . . as it relates to Mr. Franklin." *Supra* at 15. A reasonable jury could have found that this made explicit what had been implicit in all Avenatti's dealings with Nike: if Nike paid Avenatti millions of dollars, he would advise his client to settle his claims with Nike; but without such a payment to Avenatti, he would make sure there was no settlement with Franklin.

Thus, at his first, March 19, 2019 meeting with Nike representatives, Avenatti stated that to settle with Franklin, Nike is "going to do two things": (1) "pay a civil settlement" to Franklin for "breach of contract, tort, or other claims," *and* (2) hire Avenatti "to conduct an internal investigation into corruption in basketball." *Supra* at 9. As Wilson testified, he understood the demands were "[s]eparate but *both* mandatory." *Supra* at 9 n.6 (emphasis added).

Then, on the March 20, 2019 telephone call with Wilson, Avenatti reiterated that any settlement with Franklin depended on a payout to Avenatti: "I mean we're gonna get a million five for our guy, and we're gonna be hired to handle the internal investigation, and if you don't wanna do that, we're done." *Supra* at 12. Further, in making clear that settlement was contingent on Nike agreeing to a retainer in excess of $10 million, Avenatti warned that if Nike thought it could cap the demanded retainer "at 3 or 5 or 7 million, . . . let's just be done." *Id.* Avenatti made plain the consequences of being "done": he would hold a press conference that would not only embarrass Nike but also take billions of dollars off the company's market value. *See supra* at 16. Implicit in this extortionate threat was an offer of forbearance if Nike agreed to both of Avenatti's demands. But also

47

implicit was an offer of action: if Nike agreed to Avenatti's demands, he would act to secure his client's consent to settlement of his claims. Avenatti could make this offer only because he enjoyed an attorney-client relationship of trust with Franklin. It was this trust that he offered to violate (the *quo*) in return for Nike meeting his payment demand (the *quid*).

Indeed, trial evidence permitted a reasonable jury to find that Avenatti was already laying the groundwork to deliver this *quo* in return for Nike's *quid*. Thus, at the same time that Avenatti was repeatedly assuring Franklin that negotiations with Nike were going well, *see supra* at 11, 16, he was concealing from his client that (1) Avenatti was pursuing only one of Franklin's objectives (compensation) while abandoning all others, (2) Avenatti had conditioned settlement of Franklin's claims (for $1.5 million compensation) on a multi-million-dollar retainer for himself, (3) Nike was inclined to pay Franklin $1.5 million in settlement—and possibly more if it could avoid Avenatti's retainer demand, (4) Avenatti had specifically shot down the idea of Nike paying a larger amount to Franklin, and (5) Avenatti had proposed preparing two documents to effect his demands—a $1.5 million settlement agreement between Franklin and Nike (that Franklin would sign) and a $15-25 million retainer agreement between Avenatti and Nike (that Franklin would not sign), *see supra* at 9-16. On this record, a reasonable jury could have concluded that Avenatti had thus positioned himself to influence Franklin to accept a $1.5 million payment to settle his claims with Nike without Franklin ever needing to know, much less approve, Avenatti's own multi-million-dollar side agreement with Nike. Moreover, the jury did not have to infer that knowledge of the

48

side deal would have mattered to Franklin in assessing a settlement recommendation from Avenatti. Franklin specifically testified to that effect. *See* Trial Tr. 1571-72 (responding "Yes" to question whether he would have "wanted to know if the defendant was making a settlement for you dependent on him getting hired by Nike").

Avenatti's alternative $22.5 million proposal compels no different conclusion because, as discussed *supra* at 36-37, a reasonable jury could have concluded that the bulk of this amount was destined for Avenatti, not Franklin. Thus, Avenatti did not tell Franklin about the proposal, or how he planned to effect it, for much the same reason he never told him about the demanded retainer: the less Franklin knew about how his own receipt of a $1.5 million settlement was conditioned on a multi-million-dollar payment for Avenatti, the easier it would be to influence him to settle his claims.

In offering corruptly to influence Franklin's acceptance of the proposed settlement, Avenatti may well have been serving his own interests more than Nike's. In short, his demanded *quid* was far more valuable than his offered *quo*. But in determining whether a person has solicited a bribe, the relevant inquiry is not the likelihood of the solicited party meeting a demand in return for the offered act, or even whether that party values the offered act. What matters is that an act was corruptly offered in return for the demanded thing of value.[29]

---

[29] *See* 11 C.J.S. *Bribery* § 14 (2023) ("Where it is alleged the accused solicited a benefit as consideration for an official act, it is not necessary for the state to prove the party to whom the solicitation was made accepted the proposition or even understood the unlawful nature of the proposition to obtain a conviction for bribery; proof that the solicitation was made by the

Here, the evidence was sufficient to allow a reasonable jury to conclude that Avenatti offered to breach his attorney-client relationship with Franklin to influence him to settle his claims with Nike, but only if Nike paid Avenatti many millions of dollars. This satisfied the *quid pro quo* requirement for bribery.

## 2. Intent To Defraud

Because Avenatti's sufficiency challenge to the proof of his intent to defraud Franklin largely echoes his wrongfulness challenge, it fails for much the same reason. *See supra* at 26-41. Rather than repeat the totality of the evidence there discussed, we highlight three facts that, when viewed in the light most favorable to the prosecution, support a reasonable jury finding that Avenatti intended to defraud Franklin of the honest services owed to him as an attorney's client.

*First*, Avenatti leveraged his client's claim to enrich himself, in clear conflict with his client's interests.[30] Specifically, at the same time

accused with the purpose to promote or facilitate the exchange of the benefit for the official action is all that is required."); *see also United States v. Quinn*, 359 F.3d at 677 (upholding solicitation conviction even though solicitee did not intend to pay bribe because "[i]t is the defendants' intent that is relevant," not the solicitee's).

[30] As the district court charged the jury without objection, an attorney's "duty of loyalty" to a client obligates the lawyer to put the "client['s] interests first." Trial Tr. 2337. "Moreover, a lawyer shall not, without informed written consent from the client, represent a client if there is a significant risk that the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client, a third party, or *by the lawyer's own interests*." *Id.* (emphasis added); *see United States v. Schwarz*, 283 F.3d 76, 96 (2d Cir. 2002) (finding unwaivable conflict of interest where counsel had "substantial self-interest

that Avenatti demanded $1.5 million in compensation for Franklin, Avenatti also demanded an even greater payoff for himself, making plain that there could be no discussion of the former without Nike's agreement to the latter. *See supra* at 47-49. Further, while Avenatti proposed for the payoff to take the form of a $15-25 million retainer, a reasonable jury could have concluded that this represented neither fees already earned by Avenatti in representing Franklin in negotiations with Nike nor fees that Avenatti expected to earn in conducting a future *bona fide* internal investigation of Nike. Rather, a reasonable jury could have concluded that a retainer agreement was merely a convenient vehicle for Avenatti to receive the personal multi-million-dollar payment he was demanding from Nike to encourage his client to agree to settlement.

*Second*, Avenatti sacrificed his client's interests in favor of his own. Specifically, when Nike suggested that it might be possible to settle the matter by paying Franklin something more than $1.5 million without a retainer for Avenatti, Avenatti stated, "I don't think that it makes any sense for Nike to be paying, um, an exorbitant sum of money to Mr. Franklin, in light of his role in this." *Supra* at 15. A reasonable jury could have concluded that an attorney who thus sought to avoid higher compensation for his client in order to maintain the viability of his own multi-million-dollar retainer demand was not providing honest services for his client but, rather,

---

in the two-year, $10 million retainer agreement" his firm had with organization whose civil case could be significantly affected by defendant's criminal case).

51

was intent on defrauding him into accepting a settlement that enriched the lawyer more than the client.

*Third*, Avenatti took active steps to ensure that Franklin would never know that, in settling his claims against Nike, Avenatti had so enriched himself at Franklin's expense. In urging otherwise, Avenatti argues that Franklin would have had to sign off on any settlement, and thus have known its terms. Not so. As the evidence showed, on March 21, 2019, Avenatti proposed using two documents to effect his demands: (1) a $1.5 million settlement agreement between Franklin and Nike, and (2) a $15-25 million retainer agreement between Avenatti and Nike. A reasonable jury could conclude that Franklin would have to sign only the first agreement, not the second. For this reason and because the settlement agreement made no mention of the retainer agreement, a reasonable jury could further conclude that Avenatti's intent was to conceal from Franklin the fact that he had used his client's claims to negotiate a better deal for himself than for his client, and thereby, fraudulently to influence Franklin to accept the proposed settlement. It could also conclude that Avenatti would have found some way to do the same if Nike had accepted his alternative $22.5 million proposal.

In sum, a reasonable jury could have concluded from the trial evidence that Avenatti, while representing his client Franklin in negotiations with Nike, used a *quid pro quo* to solicit a bribe from Nike, and, moreover, did so with the intent to defraud Franklin of the honest services owed to him by his attorney. Thus, Avenatti's sufficiency challenge to his honest-services fraud conviction fails on the merits.

52

## II.     Jury Instruction: Honest-Services Fraud

Because "a violation of a fiduciary duty[] is an element of honest services fraud," *United States v. Napout*, 963 F.3d 163, 181 (2d Cir. 2020) (internal quotation marks omitted), the district court charged the jury at length regarding the duties an attorney owes a client, specifically, the duties imposed by California law on attorneys such as Avenatti licensed to practice in that state.[31]  Avenatti argues

---

[31] We quote the district court's instruction on this point in its entirety, highlighting language focusing on California law:

> Lawyers owe a duty of loyalty to their clients.  This means that, when acting on behalf of a client, lawyers must put their clients' interests first.

> Moreover, a lawyer shall not, without informed written consent from the client, represent a client if there is a significant risk that the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client, a third party, or by the lawyer's own interests.  Informed consent means a client's agreement to a proposed course of conduct after the lawyer has communicated and explained (i), the relevant circumstances; and (ii) the material risks, including any actual and reasonably foreseeable adverse consequences of the proposed course of conduct.

> A conflict of interest requiring informed written consent exists if there is a significant risk that a lawyer's ability to consider, recommend, or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities, interests, or relationships, whether legal, business, financial, professional, or personal.

> *Under California law, it is the client who defines the objectives of the representation and not the lawyer.  A lawyer cannot act without the client's authorization, and a lawyer may not take over decision-making for a client, unless the client has authorized the lawyer to do so.  A lawyer must abide*

*by a client's decision concerning the objectives of the representation and shall reasonably consult with the client as to the means by which the objectives are to be pursued. Subject to requirements of client confidentiality, a lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. The client has the ultimate authority to determine the purposes to be served by the legal representation, however, within the limits imposed by law and the lawyer's professional obligations. A lawyer retained to represent a client is authorized to act on behalf of the client, such as in procedural matters and in making certain tactical decisions. A lawyer is not authorized merely by virtue of the lawyer's retention to impair the client's substantive rights or the client's claim itself.*

*In the context of settlement, only the client may decide whether to make or accept an offer of settlement.*

*Lawyers owe a duty of confidentiality to their clients. The duty includes information that the client wants kept in confidence because it might be embarrassing or otherwise detrimental to the client. The duty of confidentiality requires a lawyer not to reveal confidential client information unless the client has given informed consent to the disclosure, as I have previously defined that term. A lawyer shall not use a client's confidential information to the disadvantage of the client unless the client gives informed consent.*

*Lawyers are required to keep clients reasonably informed of significant developments in matters with regard to which the attorney has agreed to provide legal services and to respond promptly to reasonable status inquiries of clients. A lawyer must also reasonably consult with the client about the means by which the lawyer will try to achieve the client's goals and objectives; keep the client reasonably informed about significant developments relating to the representation; and explain a matter to a client to the extent reasonably necessary to permit the client to make informed decisions during the representation. Reasonably refers to the conduct of a reasonably prudent and competent lawyer. A lawyer owes his client a duty of full and frank disclosure of all relevant information relating to the subject matter of the representation.*

54

that the district court erred by failing to give his proposed jury instructions as to an attorney's authority (1) generally to act on his client's behalf, and (2) specifically to settle claims.

We review alleged charging errors *de novo*, applying a harmless-error standard if the defendant voiced an objection in the district court. *See United States v. Zhong*, 26 F.4th 536, 549-50 (2d Cir. 2022). On harmless-error review, a defendant must demonstrate (1) that "the instruction given was erroneous, *i.e.*, that when viewed as a whole, the instruction misled or inadequately informed the jury as to the correct legal standard"; (2) that his requested instruction "was correct in all respects"; and (3) "ensuing prejudice." *United States v. Felder*, 993 F.3d 57, 63 (2d Cir. 2021) (internal quotation marks omitted). Put another way, an omitted instruction will warrant relief from conviction only "if (1) the requested instruction was legally correct; (2) it represents a theory of defense with basis in the record that would lead to acquittal; and (3) the theory is not effectively presented elsewhere in the charge." *United States v. Prawl*, 168 F.3d 622, 626 (2d Cir. 1999) (internal quotation marks omitted). Avenatti cannot satisfy this standard as to either of his charging challenges.[32]

----

*A lawyer shall promptly communicate to the lawyer's client all amounts, terms, and conditions of any written offer of settlement made to the client. An oral offer of settlement made to a client in a civil matter must also be communicated if it is a significant development in the representation.*

Trial Tr. 2337-40 (emphasis added).

[32] We therefore need not consider the government's argument that because Avenatti's second charging challenge was not adequately preserved in the district court, it is reviewable on appeal only for plain error. *See United*

55

## A. Attorney's General Authority To Act on Client's Behalf

Avenatti faults the district court for failing to include the following language in the part of its charge referencing an attorney's authority to act for his client:

> A lawyer begins with broad authority to make choices advancing the client's objectives. . . .
>
> In the absence of an agreement or instruction, however, a lawyer has the authority to take any lawful measure within the scope of representation that is reasonably calculated to advance a client's objectives as defined by the client.

Appellant Br. 50-51 (ellipses in original) (quoting Special App'x 47). Avenatti submits that inclusion of this language would have allowed him to advance "'a theory of defense with basis in the record that would lead to acquittal,' namely: When Avenatti asked Nike to hire him and Geragos to conduct an internal investigation, he reasonably believed himself to be acting within his authority in pursuit of Franklin's objectives." *Id.* at 55 (citation omitted) (quoting *United States v. Prawl*, 168 F.3d at 626).

Assuming *arguendo* that Avenatti's proposed language finds some support in California law, he nevertheless fails to demonstrate error because the challenged instruction, when viewed as a whole, did not mislead or inadequately inform the jury as to the correct legal standard respecting an attorney's authority to act for his client. *See United States v. Felder*, 993 F.3d at 63. Rather, as the district court

*States v. Jenkins*, 43 F.4th 300, 302 (2d Cir. 2022) (reviewing unpreserved charging challenge for plain error).

correctly observed, what it provided was "a slightly different iteration" of Avenatti's proposed authority instruction, thereby "allow[ing] each side to make [its] arguments." Trial Tr. 2034-35; *see United States v. Evangelista*, 122 F.3d 112, 116 (2d Cir. 1997) ("[D]efendants are not necessarily entitled to have the exact language of the charge they submitted to the district court read to the jury." (internal quotation marks omitted)).

Thus, respecting attorney authority, the district court correctly instructed as follows:

> [A] lawyer may take such actions on behalf of the client as is impliedly authorized to carry out the representation. The client has the ultimate authority to determine the purposes to be served by the legal representation, however, within the limits imposed by law and the lawyer's professional obligations. A lawyer retained to represent a client is authorized to act on behalf of the client, such as in procedural matters and in making certain tactical decisions. A lawyer is not authorized merely by virtue of the lawyer's retention to impair the client's substantive rights or the client's claim itself.

Trial Tr. 2338. While the instruction did not explicitly define "impliedly authorized" to include the "broad authority to make choices advancing the client's objectives"—the language Avenatti sought—that concept is adequately conveyed by the challenged instruction's reference to "such actions as . . . carry out the representation," as well as its recognition of attorney authority to act on "procedural matters" and to make "certain tactical decisions." "Choices advancing the client's objectives" are reasonably described

57

as "tactical." *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2327 (Philip Babcock Gove ed., 2002) ("WEBSTER'S") (defining "tactical" as "designed to achieve a given purpose"). Avenatti nevertheless argues that a juror might have thought that an internal investigation of Nike did not fit within the category of "*certain* tactical decisions" that the challenged charge stated an attorney was authorized to make. Appellant Br. 61 (emphasis added). We are not persuaded. Nothing in the charge implied, nor did the prosecution argue, that an internal investigation demand in genuine pursuit of a client's objectives is not a tactical decision that an attorney is authorized to make.[33]

In any event, the district court's charge allowed Avenatti to argue the exact defense theory for which he sought his proposed charge, *i.e.*, that, in demanding an internal investigation of Nike, "he reasonably believed himself to be acting within his authority in pursuit of Franklin's objectives." *Id.* at 55. Indeed, the district court specifically charged the jury that this was Avenatti's theory: "According to Avenatti, when he was demanding that Nike hire him and Geragos to perform an internal investigation at Nike, he was pursuing Franklin's objectives." Trial Tr. 2329. Further, it explicitly stated that Avenatti could not be found guilty of honest-services fraud if he "honestly believed that Mr. Franklin had authorized him to demand that Nike hire him and pay him millions of dollars to

---

[33] We understand the district court's qualification to recognize the handful of tactical choices that only a party can make. *See McCoy v. Louisiana*, 138 S. Ct. 1500, 1508 (2018) (recognizing that some decisions "are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal").

conduct an internal investigation of Nike." *Id.* at 2344. Thus, in summation Avenatti's counsel vigorously argued this theory. *See, e.g., id.* at 2235 ("Avenatti had every reason to believe he well understood the objectives of his client . . . including an investigation."); *id.* at 2254 ("The issue here is: Did Mr. Avenatti believe, did he understand he had the authority to demand an investigation and be paid to do it? Did he believe he was fulfilling his client's objectives when he made the ask?"); *id.* at 2262 ("If Avenatti thought that . . . his client and Mr. Auerbach had authorized him to make these demands . . . , not guilty.").

Avenatti's problem then was not that the challenged charge failed to provide him with a sufficient legal basis to argue his defense theory. Rather, his problem was that compelling evidence indicated that he had demanded a multi-million-dollar internal investigation retainer from Nike not to achieve Franklin's objectives but only to enrich himself. Accordingly, we reject his challenge to the district court's general authority instruction as meritless.

## B.    Attorney's Settlement Authority

Avenatti also faults the district court for failing to give the following instruction:

> In the absence of a contrary agreement or instruction, a lawyer has authority to initiate or engage in settlement discussions, although not to conclude them. . . .

> Ultimately, the lawyer shall abide by the client's decision whether to settle the matter and the client must sign the settlement agreement.

59

Appellant Br. 51 (ellipses in original) (quoting Special App'x 47). He submits that this language would have allowed him to argue that, in his settlement negotiations with Nike, he "was incapable of impairing Franklin's substantive rights, and never intended to conceal anything from his client, because any settlement of Franklin's claims would have been reduced to writing and signed by the parties—including Franklin." *Id.* at 55 (internal quotation marks omitted).

The argument fails because the district court effectively charged the jury that "only the client may decide whether to make or accept an offer of settlement," Trial Tr. 2338; that a lawyer was obligated "promptly" to communicate to a client "any written offer of settlement," *id.* at 2339-40; and that Avenatti contended "that the parties contemplated a written settlement, which would have required Franklin's signature," *id.* at 2329. These instructions were sufficient to allow Avenatti's counsel to argue his defense theory, which he, in fact, did. *See id.* at 2241 ("There would have to be letters of engagement, all signed by the parties. Nothing was going to be concealed from Mr. Franklin. Nothing."); *id.* at 2258 ("Just because the lawyer is looking to get paid, so long as the client signs off on it, and there's every, every piece of evidence needed in this case to prove that Gary Franklin, if ever Nike was going to make an offer which involved Avenatti getting paid, Franklin would have signed off on it if he approved it. Nike would have required Franklin to sign off on it if Franklin approved it.").

Here too then, Avenatti's problem was not that the district court's charge did not provide him with an adequate legal basis to argue his defense theory. His problem was evidence refuting that

60

theory, specifically, evidence showing that Avenatti was planning to use separate documents to reflect Nike's $1.5 million settlement with Franklin and its $15-25 million retainer of Avenatti, such that Franklin would sign and approve only the former, while being wholly ignorant of the latter.

Accordingly, Avenatti's challenge to the district court's instruction as to an attorney's settlement authority also fails on the merits.

## III.    Restitution

The MVRA "requires a court to order full restitution to the identifiable victims of certain crimes"—including Title 18 property crimes—"without regard to a defendant's economic circumstances." *United States v. Zakhary*, 357 F.3d 186, 189 (2d Cir. 2004) (citing 18 U.S.C. §§ 3663A, 3664).  Avenatti argues that two errors of law require reversal of the $259,800.50 MVRA award to Nike: (1) the district court exceeded its authority in awarding restitution more than 90 days after Avenatti's initial February 8, 2021 sentencing, *see* 18 U.S.C. § 3664(d)(5); and (2) the MVRA does not apply to Nike because its incurred attorneys' fees do not manifest the "pecuniary loss" required to identify the company as a "victim," *id.* § 3663A(a)(2), (c)(1)(B).  We review a challenged restitution award only for abuse of discretion, which may be evident where the award is grounded in an error of law, which we review *de novo*.  *See United States v. Afriyie*, 27 F.4th 161,

61

166 (2d Cir. 2022). Applying that standard here, we identify no error.[34]

### A. Timeliness of Restitution Order

Title 18 U.S.C. § 3664 states procedures for issuing and enforcing orders of restitution. One such procedure pertains when a court lacks sufficient information at the time of sentencing to determine the losses warranting restitution:

> If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.

*Id.* § 3664(d)(5).

There is no question here that the February 18, 2022 restitution award, entered 221 days after Avenatti's initial July 8, 2021 sentencing, falls outside this statutory 90-day period. That, however, does not mean that the district court lacked authority to enter the challenged restitution award. In *Dolan v. United States*, 560 U.S. 605 (2010), the Supreme Court expressly ruled that "[t]he fact that a sentencing court misses the statute's 90-day deadline, even through its own fault or that of the Government, does not deprive the court of the power to order restitution," *id.* at 611. In so holding, the Court declined to construe the statutory 90-day deadline as either a "jurisdictional condition" or a "claims-processing rule." *Id.* at 610

---

[34] Because we identify no error, we need not consider the government's argument that Avenatti's timeliness challenge was forfeited below and, thus, reviewable only for plain error. *See supra* at 55 n.32.

(internal quotation marks omitted).  Rather, it construed the provision as "a time-related directive that is legally enforceable but does not deprive a judge or other public official of the power to take the action to which the deadline applies if the deadline is missed."  *Id.* at 611.

Avenatti does not dispute that *Dolan* binds this court.  Instead, he urges us to read the decision narrowly to authorize restitution awards more than 90 days after sentencing only in cases where the sentencing court "'made clear prior to the deadline's expiration that it would order restitution.'"  Appellant Br. 62 (quoting *Dolan v. United States*, 560 U.S. at 608).  When we consider the quoted language in context, we do not think it compels Avenatti's conclusion.

This is what the Supreme Court said in *Dolan*:

We hold that a sentencing court that misses the 90-day deadline nonetheless retains the power to order restitution—*at least where*, as here, the sentencing court made clear prior to the deadline's expiration that it would order restitution, leaving open (for more than 90 days) only the amount.

560 U.S. at 608 (emphasis added).  As the highlighted text indicates, *Dolan* does not hold that a court is barred from awarding restitution more than 90 days after sentencing *unless* it "made clear prior to the deadline's expiration that it would order restitution."  It states only that a court retains the power to award restitution more than 90 days after sentencing "*at least where*" it made its intent to award restitution clear within 90 days of sentencing.  *Id.* (emphasis added).  In other words, *Dolan* identifies the clearest—not the exclusive—circumstance

for a court to continue to exercise its MVRA restitution authority past the statutory 90-day period.[35]

In applying *Dolan* in the circumstances of this case, we consider six factors that the Supreme Court identified as informing its conclusion that a missed 90-day deadline "does not deprive the court of the power to order restitution." *Id.* at 611. These are, (1) the statute's failure to specify a consequence for noncompliance with its timing provision, which cautions against judicially imposed coercive sanctions, *see id.* at 611 (collecting cases); (2) the statutory importance of imposing restitution in the "full amount of each victim's losses," *id.* at 612 (quoting 18 U.S.C. § 3664(f)(1)(A)); (3) recognition that the statute's time provision "is *primarily* designed to help victims of crime secure prompt restitution rather than to provide defendants with certainty as to the amount of their liability," *id.* at 613 (emphasis in original); (4) the fact that denial of court authority will most harm crime victims "who likely bear no responsibility for the deadline's being missed and whom the statute also seeks to benefit," *id.* at 613-14; (5) precedent concluding that other missed statutory deadlines do not deprive courts of power to act, *see id.* at 614-15 (collecting cases); and (6) defendants' general ability to mitigate any harm to themselves from a missed 90-day deadline, *e.g.*, by alerting the court that the "deadline will be (or just has been) missed," *id.* at 615-16.

The Court derived the first five factors from the "the language, the context, and the purposes" of § 3664(b)(5). *Id.* at 611. Those remain the same regardless of whether a district court makes clear within 90 days of sentencing that it will order some amount of restitution. Thus, these factors all support the district court's

---

[35] *See generally* WEBSTER'S 1287 (defining "at least" as "at the lowest estimate : as the minimum" or "in any case : at any rate").

authority to enter the challenged restitution order in this case. It is the sixth factor that may vary with the circumstances of a particular case. This court's pre-*Dolan* precedent effectively accounts for that. At the same time that we—like the Supreme Court—recognize that § 3664(d)(5)'s deadline "is more consistent with Congress's concerns about preventing the dissipation of a defendant's assets, than with protecting a defendant from a drawn-out sentencing process," *United States v. Stevens*, 211 F.3d 1, 4 n.2 (2d Cir. 2000), our precedent affords a defendant the opportunity to challenge a restitution order as untimely by showing that the delay caused him actual prejudice, *id.* at 5-6; *accord United States v. Zakhary*, 357 F.3d at 191 (holding "district court's failure to determine identifiable victims' losses within ninety days after sentencing" is "harmless error . . . unless [defendant] can show actual prejudice from the omission").

Avenatti argues that our pre-*Dolan* precedent is incompatible with *Dolan*, which "does not use a harmless error analysis." Appellant Br. 68 (quoting CATHARINE M. GOODWIN, FEDERAL CRIMINAL RESTITUTION § 10:22 (Aug. 2021 ed.)). But *Dolan*'s focus was on a court's authority to award restitution more than 90 days after sentencing, not on whether it could be error—possibly harmless—for the court not to have acted within that 90-day period. We think the possibility of § 3664(d)(5) error is implicit in *Dolan*'s recognition that the statutory 90-day deadline is "legally enforceable." 560 U.S. at 611. We think the possibility of such error being harmless is implicit in *Dolan*'s recognition that (1) a missed § 3664(d)(5) deadline does not "deprive the court of the power to order restitution," *id.*; (2) the deadline "seeks speed primarily to help the victims of crime and only secondarily to help the defendant," *id.* at 613; and (3) defendants generally have the ability to avoid or mitigate any harm from a missed § 3664(d)(5) deadline, *id.* at 615-16. Together, these principles support

the conclusion that a delay of more than 90 days in awarding restitution, if error at all, is not one affecting a defendant's substantial rights and, thus, is properly deemed harmless to the defendant "unless he can show actual prejudice from the omission." *United States v. Zakhary*, 357 F.3d at 191; *see United States v. Stevens*, 211 F.3d at 5-6.[36]

Avenatti can show no prejudice here. Even if the district court did not expressly state within the 90-day period that it would award Nike some amount of restitution, it did make clear at the time of the July 8, 2021 sentencing that the question of restitution was still pending before the court and that further submissions were necessary for a decision on any award. The district court stated as follows:

> As to Nike, the submissions to date are not adequate to permit me to make a determination as to restitution. The billing records submitted in support of the application have been redacted in such a way to make it impossible to determine whether the fees sought fall within the recoverable categories as set forth in *Lagos v. United States*, 138 S. Ct. 1684 (2018).

Sent'g Tr. 46. Then, after detailing certain specific concerns, the court stated, "I will give the government and Nike another opportunity to make a submission as to restitution that complies with *Lagos*." *Id.* at 47-48. On this record, Avenatti cannot have thought that the district court was entering "a final sentence" on July 8, 2021, and "thus relinquishing authority to order restitution, only then to impose restitution more than ninety days thereafter." *United States v. Gushlak*,

---

[36] In so holding, we avoid one commentator's concern that *Dolan* might support a delayed restitution award "even if the defendant were to prove prejudice." GOODWIN, *supra* at 65, § 10:22.

728 F.3d 184, 191 n.4 (2d Cir. 2013).  That concern, which *Dolan*'s proviso sought to guard against, *see id.*, is simply not present here.  In sum, because the district court made clear at sentencing that the question of restitution was still very much pending, Avenatti cannot claim any prejudice from disturbed expectations of repose.

Further, in *Dolan*, the Supreme Court observed that a defendant can be expected to mitigate the harm of § 3664(d)(5) delay if he "obtains the relevant information regarding the restitution amount before the 90-day deadline expires."  560 U.S. at 615-16.  Avenatti received all information relevant to restitution well before that deadline.  The prosecution filed its supplemental submissions (with Nike's exhibits attached) on July 15, 2021.  Avenatti filed his supplemental opposition a week later, on July 21, 2021.  Thus, he cannot complain of any prejudice to his ability to be heard.  *See generally United States v. Stevens*, 211 F.3d at 6 (finding § 3664(d)(5) delay harmless where, *inter alia*, "defendant has not alleged that any documents or witnesses became unavailable after the 90-day period had run").

Moreover, at no time thereafter did Avenatti alert the district court to the approaching (or missed) § 3664(d)(5) 90-day deadline.  *See Dolan v. United States*, 560 U.S. at 615-16.  The omission is telling in light of the apparent reason for delay in issuing the challenged award.  On July 14, 2021—approximately one week after the initial sentencing and while the district court was awaiting the parties' supplemental filings—the prosecution, on behalf of Nike, requested that the "*payment* of any restitution award" to the company "be delayed until any individual victims in the defendant's other pending cases are paid restitution, if ordered."  *Avenatti II*, 2022 WL 452385, at *4 n.3

(internal quotation marks omitted) (emphasis added).[37] While the request did not expressly seek delay of a restitution *award* (as distinct from its payment), as the district court subsequently explained, it did not understand the MVRA to authorize it "to create a schedule for restitution payments that takes into account a hypothetical restitution order in another case, in which no judgment of conviction has been entered." *Id.* at *11. Thus, it delayed its restitution decision in the instant case—at least for a time. We need not here decide whether the district court correctly understood its authority. We note simply that Avenatti, with knowledge of the prosecution's application for delay, neither opposed the request nor urged the district court to decide before expiration of the § 3664(d)(5) deadline whether it would award some amount of restitution.

Rather, it was the district court that, on February 14, 2022, itself decided that it would "not further delay the determination of restitution in the instant case." *Id.* at *4 n.3 (discussing status of Avenatti's other criminal cases). In a thorough written opinion, the court addressed each part of Nike's restitution claim and Avenatti's opposition thereto and, on February 18, 2022, entered an amended judgment ordering Avenatti to pay Nike $259,800.50 in restitution, considerably less than the $1 million originally sought, or the $856,162 sought in the supplemental filing.[38] Nothing in the record suggests

---

[37] *See United States v. Avenatti*, No. 19-cr-374 (S.D.N.Y.) (charging wire fraud and aggravated identity theft); *United States v. Avenatti*, No. 19-cr-61 (C.D. Cal.) (charging wire and bank fraud, identity theft, tax crimes, and perjury).

[38] The district court concluded that, under the MVRA, Nike was entitled to recover attorneys' fees incurred in "(1) participating in recorded meetings and calls, conferring with the prosecutors and the FBI, and responding to the government's requests for documents and information; (2) preparing Nike and Boies Schiller witnesses for interviews by the government and to

that Avenatti would have received a more favorable restitution ruling if the order had been entered within 90 days of sentencing or that he was otherwise prejudiced by the delay.

In sum, Avenatti's timeliness challenge to the district court's restitution award fails on the merits because (1) the factors informing *Dolan*'s acknowledgment of district court authority to enter restitution orders more than 90 days after sentencing apply equally here, and (2) Avenatti has demonstrated no prejudice from entry of the challenged award more than 90 days after sentencing.

## B.    "Pecuniary Loss"

In ordering restitution under the MVRA, a court must consider two distinct questions: (1) does the MVRA apply in the case at hand; and, if so, (2) what is compensable as restitution?  *See, e.g., United States v. Razzouk*, 984 F.3d 181, 186-90 (2d Cir. 2020) (considering first

---

testify at Mr. Avenatti's trial; and (3) representing Nike in connection with sentencing and restitution."  *Avenatti II*, 2022 WL 452385, at *9 (internal quotation marks and brackets omitted).  It concluded that Nike was not entitled to recover fees incurred in analyzing court filings and motions in Avenatti's criminal case, or in attending pretrial conferences and portions of the trial during which Nike witnesses did not testify, as neither such review nor attendance had been requested by the government.  *Id.*  Nor was Nike entitled to recover fees incurred in itself moving to quash Avenatti's subpoenas to the company and its employees, as these motions were motivated by Nike's "self-preservation" rather than a desire to provide assistance to the government.  *Id.* (internal quotation marks omitted).  Further, insofar as Boies Schiller had employed "block billing for its time entries," a process that "mix[ed] and mingle[d] recoverable expenses . . . with non-recoverable expenses," the district court "subtracted from the total requested amount any entry that contains an unrecoverable expense," and specifically identified each such entry in its opinion.  *Id.* at *10 & nn.6, 8.

whether MVRA applied to conviction and then whether loss was correctly calculated).

As to the first question, the MVRA authorizes restitution only when (1) a defendant is being sentenced for a specified crime including, as relevant here, a Title 18 "offense against property," 18 U.S.C. § 3663A(c)(1)(A)(ii)[39]; and (2) "an identifiable victim or victims has suffered a physical injury or pecuniary loss," *id.* § 3663A(c)(1)(B). The MVRA defines "victim" as,

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

*Id.* § 3663A(a)(2).  Read together, these statutory sections signal that the MVRA applies to a person who has suffered physical injury or pecuniary loss as a direct and proximate result of the commission of a specified crime.  Only where that is the case does a court proceed to the second question to determine what is compensable as restitution.

On that point, the MVRA states, as pertinent here, that "in the case of an offense resulting in . . . loss . . . of property," for which "return of the property . . . is impossible," a restitution order shall require the defendant to pay the victim "the value of the property" on either the date of loss or the date of sentencing, whichever is greater.

---

[39] Avenatti does not dispute that the extortion crimes for which he has been ordered to make restitution to Nike are offenses against property.

*Id.* § 3663A(b)(1). In addition, and "in any case," the MVRA mandates that a restitution order require the defendant to "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." *Id.* § 3663A(b)(4). Such "'other expenses' may include attorneys' fees," *United States v. Afriyie*, 27 F.4th at 163, but only if incurred during participation in a government investigation or prosecution of the offense or attendance at criminal proceedings related to the offense, *see Lagos v. United States*, 138 S. Ct. at 1690 (holding that § 3663A(b)(4) does not cover costs of private investigation or attendance at civil proceedings); *accord United States v. Afriyie*, 27 F.4th at 171 (holding § 3663A(b)(4) to reference *criminal* investigation).

Avenatti argues that the district court erred at the first step of inquiry. He submits that the MVRA does not apply in this case because the attorneys' fees for which Nike sought compensation did not constitute a "pecuniary loss" within the meaning of § 3663A(c)(1)(B). He insists that even if such fees are "other expenses incurred during participation in the investigation or prosecution" of an offense so as to be compensable under § 3663A(b)(4) *if* the MVRA applies, they do not themselves constitute the "pecuniary loss" necessary *for* the MVRA to apply.[40]

---

[40] Avenatti does not dispute that where a victim sustains a pecuniary loss, he is entitled to restitution of § 3663A(b)(4) expenses even if they do not themselves constitute pecuniary loss.

Avenatti points to no precedent from this court or the Supreme Court that so holds. The binding caselaw he does cite discusses § 3663A(b)(4) only in addressing the second MVRA question—What is compensable as restitution?—without speaking to the first—Does the MVRA apply?[41] Nevertheless, some support for Avenatti's argument can be found in an unpublished district court decision from outside this circuit: *United States v. Yu Xue*, No. 16-cr-22, 2021 WL 2433857 (E.D. Pa. June 15, 2021). In sentencing a defendant for conspiracy to steal trade secrets, the court found the secrets' owner to have sustained "$0 of fraud loss under the Sentencing Guidelines." *Id.* at *2 & n.4 (referencing government concession that "there is no fair market" for the trade secrets (brackets omitted)). It therefore declined to award restitution of attorneys' fees incurred by the owner during the government's investigation and prosecution of the offense, concluding that the MVRA did not apply to the defendant "because there was no pecuniary loss" to the secrets' owner. *Id.* at *3.

The district court here was not persuaded by the reasoning in *Yu Xue*. *See Avenatti II*, 2022 WL 452385, at *7. Instead, it followed that of our colleague, Judge Chin, sitting by designation in *United*

---

[41] *See, e.g., Lagos v. United States*, 138 S. Ct. at 1690 (holding cost of private post-offense investigation not recoverable under § 3663A(b)(4), but leaving other parts of restitution award undisturbed); *United States v. Afriyie*, 27 F.4th at 166 ("Afriyie does not challenge that MSD . . . is a victim covered by the MVRA . . . [or] that his crimes of conviction . . . are covered offenses."); *United States v. Amato*, 540 F.3d 153, 159 (2d Cir. 2008) ("It is undisputed that § 3663A(b)(4) applies to the fraud offenses committed by the defendants in the present case."), *abrogated in part by Lagos v. United States*, 138 S. Ct. 1684 (abrogating § 3663A(b)(4) award of attorneys' fees to extent incurred in private investigation).

*States v. Kuruzovich*, No. 09-cr-824, 2012 WL 1319805 (S.D.N.Y. Apr. 13, 2012), *abated*, 541 F. App'x 124 (2d Cir. 2013) (abating restitution order in light of defendant's death and insolvency of estate). The defendant in that case was convicted of blackmailing his corporate employer with threatened reports of illegal activity. While participating in the government's investigation and prosecution of that crime, the company incurred $59,652.85 in legal fees. Judge Chin ordered defendant to pay this amount in restitution. Recognizing that the MVRA applies when a person "has suffered a 'pecuniary loss' as a result of the offense conduct," Judge Chin found the employer to have "suffered direct pecuniary loss in the form of legal expenses incurred." *Id.* at *4. He explained,

> [defendant] threatened to make serious allegations of insider trading and other illicit activity against the Company to various government authorities. As the Company's CEO testified, such allegations could have destroyed the Company. Retaining outside legal counsel to review documents requested by the government in the course of its investigation and prosecution and to address concerns over confidentiality and privilege was necessary to the Company's participation in the investigation and prosecution of defendant. *See* 18 U.S.C. § 3663A(b)(4). Such costs were a direct and foreseeable result of defendant's wrongful conduct and are recoverable as restitution to the Company.

*Id.* at *5 (internal quotation marks, first internal citation, and brackets omitted).

The district court in *Yu Xue* was dismissive of *Kuruzovich* because (1) it was decided before *Lagos*, "where the [Supreme] Court held that the language in § 3663A(b)(4) should be narrowly

interpreted"; and (2) the MVRA's language "distinguishes between pecuniary loss and necessary expenses." 2021 WL 2433657, at *6. This does not persuade. *Lagos* held only that the "other expenses" phrase of § 3663A(b)(4) should be construed narrowly, a conclusion reached "in large part" based on the text and context of that subsection. 138 S. Ct. at 1688. Nowhere in *Lagos* did the Court suggest that text or context compels a narrow construction of the phrase "pecuniary loss" in § 3663A(c)(1)(B). In general, a "pecuniary loss" is "[a] loss of money or of something having monetary value." *Loss*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see* WEBSTER'S 1338 (defining "loss" as "the act or fact of losing: failure to keep possession: DEPRIVATION"). Attorneys' fees that the target of a specified crime incurs as a result of that crime fall within this commonly understood definition of pecuniary loss. As to *Yu Xue*'s second ground for dismissing *Kuruzovich*, the district court points to nothing in the text of the MVRA indicating that attorneys' fees qualifying as compensable expenses under § 3663A(b)(4) at the second step of MVRA analysis can never also manifest the "pecuniary loss" necessary to make the MVRA applicable at the first step of analysis.

We need not pursue the point, however, because we are not presented here with the factual premise underlying the *Yu Xue* decision, *i.e.*, that the alleged victim's *only* loss was "other expenses incurred during participation in the investigation or prosecution of the offense." 18 U.S.C. § 3663A(b)(4). Here, the record evidence demonstrates that Nike sustained a pecuniary loss in the form of attorneys' fees incurred *before* there was any government investigation of Avenatti's crimes of conviction. This is sufficient for the MVRA to apply in this case whether attorneys' fees subsequently

74

incurred during the government's investigation also constitute a pecuniary loss under § 3663A(c)(1)(B) or only "other expenses" under § 3663A(b)(4).[42]

Specifically, the trial record shows that Avenatti sought a meeting with Nike representatives in March 2021. This caused Nike to request that Boies Schiller attorneys represent it at the March 19, 2021 meeting where Avenatti first made his extortionate demands. Not surprisingly, Boies Schiller billed Nike for its attorneys' time preparing for and attending that meeting.[43] In sum, it was Avenatti's

---

[42] Although the district court did not expressly rely on this ground in awarding restitution, this court is "free to affirm on any ground that finds support in the record, even if it was not the ground upon which the trial court relied." *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 396 n.2 (2d Cir. 2018) (internal quotation marks omitted).

Insofar as the government argues that Nike also suffered a pecuniary loss when its market cap declined by $300 million in response to Avenatti's March 25, 2021 tweet, that argument fails for lack of record evidence of causation. *See* 18 U.S.C. § 3664(e) (holding that government bears "burden of demonstrating" victim loss "as a result of the offense").

[43] *See, e.g.*, Ex. C to Nike's Restitution Request 4, *Avenatti II*, 2022 WL 452385 (No. 19-cr-373), ECF No. 329-4 (detailing Wilson's billable hours on March 18 and 19, 2019, to "[p]repare for 3/19 M. Geragos and M. Avenatti meeting; confer with P. Skinner re same; . . . Conf with R. Leinwand and B. Homes and prepare for same; conf with M. Avenatti and M. Geragos, with R. Leinwand and B. Homes, and breakout confs," etc.). Although Nike originally sought restitution for these fees, it did not renew its request in the government's July 15, 2021 supplemental filing because block billing made it difficult to distinguish these "clearly recoverable" costs from unrecoverable costs. Ex. A to Gov't's Supplemental Restitution Submission 2, *Avenatti II*, 2022 WL 452385 (No. 19-cr-373), ECF No. 338-1. While Nike's failure to renew is relevant to a second-step determination of what can be

pursuit of his own criminal objectives that caused Nike to sustain the pecuniary loss of Boies Schiller's fees in connection with the March 19, 2021 meeting. This pecuniary loss was foreseeable by Avenatti, who knew that he would be dealing with Nike's outside counsel at the March 19 meeting. Moreover, Nike's loss cannot be classified as "other expenses" under § 3663A(b)(4) because it was incurred before the company participated in the government's investigation and prosecution of Avenatti. Indeed, Nike would have been obligated for these attorneys' fees even if there had never been a government investigation of Avenatti, or even if Nike had never cooperated in such an investigation. Nor can this loss be characterized as unrecoverable "costs of a private investigation that the victim chooses on its own to conduct." *Lagos v. United States*, 138 S. Ct. at 1690. Nike's obligation to pay Boies Schiller for its work in connection with the March 19 meeting arose before Avenatti revealed his extortionate scheme and, thus, could not have been for the purpose of investigating the scheme.

Instead, the fees Nike incurred in connection with the March 19 meeting are properly recognized as pecuniary losses at the core of the MVRA. Unlike § 3663A(b)(4) expenses, which an offender can reasonably foresee accruing in the future should the government investigate his criminal conduct, the fees Nike incurred in connection with the March 19 meeting accrued in the course of Avenatti's actual extortion crimes against Nike. *Cf. United States v. Amato*, 540 F.3d 153, 162 (2d Cir. 2008) (observing that "[3663A](b)(4) seems to focus more

ordered as restitution, it is irrelevant to the identification of a pecuniary loss for purposes of a step-one determination of whether the MVRA applies.

on the link between these expenses and the victim's participation in the investigation and prosecution than on the offense itself"), *abrogated in part by Lagos v. United States*, 138 S. Ct. 1684.

Nor is a different conclusion warranted because Nike's loss took the form of attorneys' fees. The target of an extortion crime can suffer a pecuniary loss not only when he pays what is demanded, but also when he spends his own money traveling to a meeting demanded by his extortioner or when he retains counsel to participate in such a meeting. In each instance, the target would not have expended, and thereby lost, his money but for the crime. In each instance, he would have sustained that loss regardless of whether the crime was ever investigated or prosecuted.

Accordingly, because the record demonstrates that Avenatti's criminal conduct caused Nike to suffer a pecuniary loss before there was any investigation or prosecution of his crimes, we can here conclude that the district court correctly applied the MVRA in this case, without needing further to consider whether that statute applies where the victim's only expenditures are those covered by § 3663A(b)(4).

## CONCLUSION

To summarize:

(1)  The trial evidence was sufficient to support Avenatti's conviction for the two charged extortion counts because a reasonable jury could find therefrom that Avenatti's threat to injure Nike's reputation and financial position was wrongful in that the multi-million-dollar demand

77

supported by the threat bore no nexus to any claim of right.

(2) The trial evidence was sufficient to support Avenatti's conviction for honest-services fraud because a reasonable jury could find therefrom that Avenatti solicited a bribe from Nike in the form of a *quid pro quo* whereby Nike would pay Avenatti many millions of dollars in return for which Avenatti—in addition to forbearing on his extortion threat—would violate his fiduciary duty as an attorney by influencing his client to accept a settlement of potential claims without realizing that he was receiving only a small fraction of the many millions of dollars that Nike would be paying Avenatti.

(3) The district court adequately instructed the jury on an attorney's authority to act for his client, both generally and specifically as pertains to settling claims.

(4) The district court did not exceed its authority under the MVRA by awarding restitution more than 90 days after initial sentencing, *see* 18 U.S.C. § 3664(d)(5), and Avenatti has shown no prejudice from the delayed award.

(5) The MVRA applies in this case where, even before any government investigation into Avenatti's extortion crimes, Nike sustained a pecuniary loss directly attributable to those crimes as a result of incurring fees for its attorneys to attend the meeting demanded by Avenatti at which he first communicated his extortionate threat.

Accordingly, because Avenatti's arguments on appeal all fail on the merits, we **AFFIRM** the February 18, 2022 amended judgment of conviction in its entirety.